PENNSYLVANIA BANK AND TRUST COMPANY, Executor of the Estate of Ethel S. Brice, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 76–155.

United States District Court, W. D. Pennsylvania.

May 9, 1978.

W. Rodgers Moore, Pittsburgh, Pa., for plaintiff.

Martin Teel, Trial Atty., Tax Div., Dept. of Justice, Washington, D. C., Thomas Daley, Asst. U. S. Atty., Pittsburgh, Pa., for defendant.

## OPINION

MARSH, District Judge.

This is an action by the executor of the estate of Ethel S. Brice to recover federal estate taxes. Jurisdiction is based on 28 U.S.C. § 1346(a)(1).

The executor, Pennsylvania Bank and Trust Company, has moved for summary judgment. The defendant, the United States, has moved for entry of judgment on the pleadings, or, alternatively, for summary judgment. Both sides have agreed that no significant facts are in dispute.

1. The Will of James W. Brice as amended by the Codicil provided in relevant part that:

"FOURTH: Providing my wife, Ethel Scoville Brice, survives me, I give, devise and bequeath forty (40%) percent of my adjusted gross estate (as determined for purposes of the marital deduction under the Federal Estate Tax Law), diminished by the devise and bequest at Items SECOND and THIRD above, to The Pennsylvania Bank and Trust Company, of Titusville, Pennsylvania, IN TRUST, NEVERTHELESS, to be designated as "Trust A" for the following uses and purposes, to-wit—

. . . . . .

## I. INCLUDIBILITY OF TRUST ASSETS IN DECEDENT'S GROSS ESTATE

The major issue is whether the estate of the decedent, Ethel S. Brice, who was incompetent from the time of her husband's death until her own death, should include the value of a trust created by the will of decedent's husband where the terms of the trust gave the decedent a general power of appointment and a power to consume. We conclude that the value of the trust should be included in decedent's estate.

The facts may be summarized as follows:

In his will executed in 1956, Dr. James W. Brice established a trust for the benefit of his wife, Ethel S. Brice. Under the trust, the decedent was given "the right during her life to consume or appoint by Will . . . the entire principal of this Trust." In 1964, Dr. Brice executed a codicil which revoked the appointment of his wife as co-executor and substituted plaintiff bank as sole executor.[1]

Dr. Brice died on February 9, 1965. His estate received a marital deduction for the value of the trust, pursuant to 26 U.S.C. § 2056.

A petition to have Mrs. Brice declared incompetent was executed on February 12, 1965. On March 31, 1965, Mrs. Brice was adjudicated an incompetent by the Orphans' Court of Crawford County, Pennsylvania. Plaintiff contends that Mrs. Brice was incompetent for a long period prior to the adjudication and has submitted an affidavit from Dr. Robert L. Taylor stating that Mrs. Brice was incompetent and lacked testamentary capacity at least from and after

2. After deducting the expenses of administration of this Trust, to pay the net income thereof quarterly to my said wife, Ethel Scoville Brice, for her life.

3. My said wife, Ethel Scoville Brice, shall have the right during her life to consume or appoint by will to her estate or in favor of named persons, or classes of persons, in Trust or absolutely, the entire principal of this Trust.

. . .

4. . . . There shall not be allocated hereto any property or the proceeds of any property which would not be allowed as part of the marital deduction."

April, 1960. Dr. Taylor's affidavit also asserts that, at least from the date of Dr. Brice's death, the condition of Mrs. Brice "was at all times progressive, hopeless and incurable." There is no contradictory evidence.

Mrs. Brice died August 15, 1969 and her will dated September 11, 1959 was admitted to probate on August 22, 1969. Mrs. Brice's will reflected an intent not to exercise any power of appointment given to her.[2]

On November 16, 1970, the plaintiff filed a United States Estate Tax Return for the estate of Mrs. Brice. The estate, as reported, included the trust, which was valued at $717,391.08. The executor paid a federal estate tax of $483,430.51, the amount shown on the return. On November 14, 1973, the plaintiff filed a claim for a refund of federal estate tax in the amount of $347,427.30, plus interest. The claim was disallowed to the extent of the issues discussed in this case.

Federal estate tax law provides that a decedent's estate includes

"any property with respect to which the decedent has at the time of his death a general power of appointment created after October 21, 1942."

26 U.S.C. § 2041(a)(2). A general power of appointment is defined as

"a power which is exercisable in favor of the decedent, his estate, his creditors, or the creditors of his estate."

26 U.S.C. § 2041(b)(1). "Exercisable" is not defined. Section 2041(b)(1)(A) provides:

"A power to consume, invade, or appropriate property for the benefit of the decedent which is limited by an ascertainable standard relating to the health, education, support, or maintenance of the decedent shall not be deemed a general power of appointment."

## A. PLAINTIFF'S ARGUMENTS

The plaintiff contends that Mrs. Brice did not have an exercisable power of appointment because, subsequent to Dr. Brice's

death, she lacked testamentary capacity; that the power to consume did not amount to a general power of appointment since in Pennsylvania a power to consume is limited by a standard of good faith; and, that the power to consume was limited by an ascertainable standard imposed by Pennsylvania law which strictly restrains the expenditures which may be made by the guardian of an incompetent.

In support of these arguments, plaintiff relies heavily on *Finley v. United States,* 404 F.Supp. 200 (S.D.Fla.1975) and *Estate of Gilchrist,* 69 T.C. 5 (1977). The opinions in these cases are quite persuasive from an equitable point of view.

The decedent in *Finley,* in accordance with a trust created by her husband's will, received the income from the trust for the extent of her life and a general testamentary power of appointment. From the time of the devise until her death, the decedent was incompetent and her will did not exercise or release the power of appointment. The court held that because the decedent "lacked the legal capacity to exercise the general testamentary power of appointment" she was prevented "from possessing a general power of appointment within the meaning of Section . . . 2041(a)(2)." 404 F.Supp. at 204.

*Gilchrist* involved a decedent who, under the terms of her husband's will, was given the right to income from all of her husband's property, along with the intervivos right to sell or transfer the property. The decedent became incompetent and remained so until her death. The tax court held that because Texas law limited the decedent's guardians by an ascertainable standard the decedent did not have an exercisable power of appointment.

Neither *Finley* nor *Gilchrist* involved all of the factors relevant to Mrs. Brice's situation. In *Finley* the decedent had no right to consume the corpus of the trust and upon initiation of the suit by her executors, the

2. The will of Ethel S. Brice contained the following provision:

"SECOND: I hereby declare that it is not my intention to exercise by any of the provisions of this Will any Power of Appointment which I may have under the Will of my husband, James W. Brice, or any other Power of Appointment which I may have."

marital deduction was withheld from her husband's estate; in *Gilchrist* no testamentary power of appointment was given to the decedent and the court was not required to address the question of how the outcome would have been affected if the events had not transpired in Texas which is a community property state.

## B. PRECEDENT CONTRARY TO PLAINTIFF'S POSITION

Prior to the decisions in *Finley* and *Gilchrist,* a line of cases had indicated that the competency of the holder of a general power of appointment was not relevant in determining whether the power was included in the holder's estate.

In *Fish v. United States,* 432 F.2d 1278 (9th Cir. 1970) *aff'g* 291 F.Supp. 59 (D.C.Or. 1968), the decedent held a general power of appointment after the death of her husband. She was competent for two years before becoming incompetent. She did not exercise the power and it lapsed. The government argued that the lapse constituted a release of the power and that the amount should therefore be included in her gross estate under Section 2041(b)(2). The wife's executors argued that because the wife was incompetent her failure to act did not constitute a release of the power.

The district court held that if the wife possessed the power of appointment at the time of her death and prior thereto, it was immaterial whether she was physically or mentally capable of exercising the power. The court stated:

> "It is not the manner in which a taxable power is exercised, but rather the *existence* of the power, that determines taxability."

291 F.Supp. at 61 (emphasis supplied). The Ninth Circuit Court of Appeals, in affirming, agreed

"that the competency of the decedent is immaterial in determining whether a lapse or release of the power occurred."

432 F.2d at 1280.[3]

In *Bagley v. United States,* 443 F.2d 1266 (5th Cir. 1971), a husband and wife were killed in an automobile crash and a state court upheld a provision in the husband's will that should he and his wife be killed simultaneously, his wife should be declared the survivor. The husband's estate received a martial deduction and the wife's estate was deemed to include a power of appointment granted by the husband's will. The court held that "[f]or the theoretical instant in which [the wife] survived her husband, the power of appointment created by the husband's will was exercisable" and therefore includible as part of her gross estate. 443 F.2d at 1270. The court was not influenced by the fact that there was no way the wife possibly could have exercised the power in the theoretical instant. It is clear that the decedent's competency to execute a will did not concern the court.

Similar logic was articulated in *Townsend v. United States,* 232 F.Supp. 219 (E.D.Tex. 1964), where the husband's will gave a power of appointment to the decedent who was alleged to be physically and mentally unable to exercise the power from the time of her husband's death until her own death. The court stated that since the decedent

> "possessed the power of appointment at the time of her death and prior thereto, it is *immaterial* . . . whether she was physically *or mentally* capable of exercising such power."

232 F.Supp. at 221, citing *Hurd v. Commissioner of Internal Revenue,* 160 F.2d 610 (1st Cir. 1947) (emphasis supplied). See also, *Commissioner of Internal Revenue v. Noel Estate,* 380 U.S. 678, 85 S.Ct. 1238, 14 L.Ed.2d 159 (1965).[4]

---

**3.** Although both the district court and the court of appeals noted that the decedent was never actually adjudicated an incompetent, this factor was inconsequential since both courts held that the competency of the decedent was immaterial. The Ninth Circuit ruled that "[s]ince we hold the matter of decedent's competence to be immaterial, we need not decide whether the decedent was in fact incompetent or wheth-

er the power could have been exercised by a guardian acting in her behalf." 432 F.2d at 1280. The court cautioned in a footnote that if the taxpayer's position were adopted, "result would be an open invitation to contest the competency of the decedent in every similar case." 432 F.2d at 1280 n. 3.

**4.** *Commissioner of Internal Revenue v. Noel Estate,* 380 U.S. 678, 85 S.Ct. 1238, 14 L.Ed.2d

The conclusion of these cases is that whether a power is "exercisable" does not depend on whether the decedent could have actually exercised the power; the health or competency of the person holding the power is immaterial. In light of the contrary conclusion reached in *Finley* and *Gilchrist,* it is helpful to determine which holdings are more consistent with the general nature of the estate tax to impose an excise on the passing of wealth from one generation to another,[5] and which approach reflects the meaning intended by Congress for the word "exercisable."

## C. MEANING OF "EXERCISABLE"

Congress first used the word "exercisable" in the Revenue Act of 1942 in a context which shows that Congress did not intend for "exercisable" to have any relationship to the competence of the donee.[6] Congress also used the word in setting forth the requirement that a power of appointment must be "exercisable" by the surviving spouse "alone and in all events" to qualify for a marital deduction. 26 U.S.C. § 2056(b)(5).

Congress intended for an "exercisable" power of appointment under § 2041 to be a power of the same kind and quality as a power of appointment "exercisable . . . in all events" which qualifies assets for the marital deduction under § 2056. See *Security-Peoples Trust Co. v. United States,* 238 F.Supp. 40 (W.D.Pa.1965). With this in mind, it can be seen that "exercisable" should be interpreted similarly in both sections and that the language of § 2056 would be rendered meaningless if it were determined that a power could be "exercisable" for purposes of § 2041 only if the surviving spouse died competent.[7] If this were the case, it could not be determined whether a donor spouse had granted a power of appointment "exercisable . . . in all events" until his spouse had died and a determination of her competency had been made. This is not compatible with the requirement that eligibility for the marital deduction must be determined on the basis

159 (1965), involved a decedent who purchased two flight insurance policies and handed them to his wife just prior to his boarding an airplane which later crashed into the ocean. Although decedent did not have possession of the policies and was therefore unable to exercise the incidents of ownership which he retained, it was held that these incidents of ownership were sufficient to cause the proceeds of the policies to be included in his gross estate for tax purposes. In an opinion by Justice Black, the Supreme Court held:

> "It would stretch the imagination to think that Congress intended to measure estate tax liability by an individual's fluctuating, day-by-day, hour-by-hour capacity to dispose of property which he owns. We hold that estate tax liability for policies 'with respect to which the decedent possessed at his death any of the incidents of ownership' depends on a general, legal power to exercise ownership, without regard to the owner's ability to exercise it at a particular moment."

380 U.S. at 684, 85 S.Ct. at 1241. See also *Round v. Commissioner of Internal Revenue,* 332 F.2d 590 (1st Cir. 1964).

5. The estate tax "is an excise imposed upon the transfer of or shifting in relationships to property at death." *United States Trust Co. v. Helvering,* 307 U.S. 57, 60, 59 S.Ct. 692, 693, 83 L.Ed. 1104 (1939). In *Fish* and *Bagley,* as in the instant case, there was a shifting of relationships created by the decedent's death, notwithstanding the physical or mental incapabili-

ties of the decedent. The statute does not require that there be an actual transfer from the decedent to a donee. Compare 26 U.S.C. § 2041(a)(2), dealing with powers of appointment created after 1942, with 26 U.S.C. § 2041(a)(1), which taxes powers of appointment created on or before October 21, 1942 only if they are "exercised" by the decedent.

6. Section 403(d)(2) of the Revenue Act of 1942 provided:

> "(2) the amendments made by this section shall not become applicable with respect to a power to appoint . . . which is *exercisable* in favor of the decedent, his estate, his creditors, or the creditors of his estate, *if* at such date *the donee* of such power *is under a legal disability* to release such power, until six months after the termination of such legal disability." (emphasis supplied).

Thus, a legal disability does not preclude a donee from holding an exercisable power.

7. This does not mean, however, that if an asset fails to qualify for the marital deduction it cannot also be included in the surviving spouse's estate. See *Peoples Trust Co. v. United States,* 412 F.2d 1156, 1162–63 (3rd Cir. 1969); *Starrett v. Commissioner of Internal Revenue,* 223 F.2d 163 (1st Cir. 1955). Sections 2056 and 2041 should not be construed as permitting only one tax on the property. See Treas. Regs. § 20.2041–1(b)(2).

of facts which exist at the date of death of the donor spouse. *Jackson v. United States,* 376 U.S. 503, 507–509, 84 S.Ct. 869, 11 L.Ed.2d 871 (1964).

Plaintiff argues that in the present case where Mrs. Brice's condition was hopeless and incurable a determination could have been made when Dr. Brice died that Mrs. Brice would never be able to competently exercise the power. Even though she had been adjudicated an incompetent, however, there was always the legal possibility that Mrs. Brice someday could regain her competency, or that she at least could have a lucid interval. Thus, as long as she lived it could not be assumed conclusively that she would not validly execute the power.[8] Dr. Brice's death was not the time to probe his surviving wife's mental status or to examine her legal papers to see if she already may have exercised the power by a will written while she was competent.

The fact that Mrs. Brice did not in fact regain her competency or exercise the power is irrelevant in our search to determine what Congress meant by the word "exercisable." But it does demonstrate that Congress could not have intended for the exer-

cisability of a power to revolve around the decedent's competency since, even in this seemingly clear case, it would not have been possible at the time of Dr. Brice's death to positively and legally determine whether he had granted a power of appointment which would be "exercisable . . . in all events."

If the statutory interpretation which plaintiff urges for the word "exercisable" were to be adopted, the payment of estate taxes could be avoided in cases, such as the instant estate, where a marital deduction is granted to the donor spouse's estate and then the surviving spouse dies incompetent.[9] This was clearly not what Congress envisioned when it utilized the word "exercisable" in §§ 2041 and 2056.[10] Congress' intent was

"to permit a married couple's property to be taxed in two stages and not to allow a tax-exempt transfer of wealth into succeeding generations."

*United States v. Stapf,* 375 U.S. 118, 128, 84 S.Ct. 248, 255, 11 L.Ed.2d 195 (1963).[11] The purpose of the marital deduction was to equalize estate taxes in community property and common law jurisdictions,[12] and this

---

**8.** Plaintiff has produced an affidavit to the effect that the decedent was "at all times progressive, hopeless and incurable." Such a situation is no more persuasive than the facts in *In re Sterrett's Estate,* 300 Pa. 116, 122, 150 A. 159, 161 (1930) wherein the Pennsylvania Supreme Court declared that it could not determine that a hopelessly insane individual would never be able to execute a will.

**9.** An examination of the marital deduction section is essential to understand the interrelationship of §§ 2041 and 2056 so that a proper interpretation of § 2041 can be applied to the facts of this case. It should be noted that we are not deciding this case on the ground that a holding in favor of plaintiff would allow the particular estate passed from Dr. Brice to Mrs. Brice to avoid taxation.

There is no reason to believe that the Internal Revenue Service erred in granting the marital deduction to Dr. Brice's estate. Its allowance was consistent with Treasury Rulings that the incompetency of the surviving spouse does not prevent the donee spouse's estate from receiving a marital deduction. Rev.Rule 75–350; Rev.Rule 55–518.

**10.** Indeed, where the donor's will has provided for a termination of the power of appointment

if the surviving spouse became incompetent, the marital deduction has not been allowed. *Starrett v. Commissioner of Internal Revenue,* 223 F.2d 163 (1st Cir. 1965).

**11.** See S.Rep. No. 1013, Pt. 1, 80th Cong., 2d Sess. 16, reprinted in (1948) U.S.Code Cong. Serv. pp. 1163, 1238.

**12.** Under a community property system, the spouse receives outright ownership of one-half of the community property and only the other half is included in the decedent's estate. The primary thrust of the marital deduction is to extend to taxpayers in common law states the advantages of "estate splitting" otherwise available only in community property states. *United States v. Stapf,* 375 U.S. 118, 128, 84 S.Ct. 248, 11 L.Ed.2d 195 (1963).

The "unmistakable" intent of Congress was to provide a liberal estate splitting device where the property passing to the surviving spouse "would ultimately—if not consumed—be taxable in the estate of the survivor." *Northeastern Pennsylvania National Bank and Trust Co. v. United States,* 387 U.S. 213, 221, 87 S.Ct. 1573, 1578, 18 L.Ed.2d 726 (1967).

purpose could potentially be defeated if residents of common law states were enabled to remove a power of appointment from a decedent's estate because of incompetency; the ability to do so could provide an advantage that would not be available to residents of community property states.

The decisions in *Bagley v. United States,* 443 F.2d 1266; *Fish v. United States,* 432 F.2d 1278, and *Townsend v. United States,* 232 F.Supp. 219, have correctly applied Congress' intent in using the word "exercisable" in § 2041. "Exercisable" refers to the existence of the power in the decedent's behalf rather than his capacity to exercise the power. Accordingly, even though a person is incompetent, he may possess an exercisable power of appointment within the meaning of § 2041. The taxable event is the possession at death of the power. There is no question that by the terms of the trust the power continued to exist in Mrs. Brice's behalf. Thus, she held an exercisable power of appointment.

### D. WAS THE POWER LIMITED BY AN ASCERTAINABLE STANDARD?

■ Plaintiff has argued that Mrs. Brice's power to consume was limited by an ascertainable standard because under Pennsylvania law she was obligated to exercise the power in good faith, and also because Pennsylvania law places tight restraints on the expenditures which a guardian may make for an incompetent.

The United States Court of Appeals for the Third Circuit has held that the limitation of good faith does not suffice as an ascertainable standard:

> "The search of § 2041 is the breadth of power given a decedent. When that is determined, the tax consequence follows. Good faith exercise of a power is not determinative of its breadth."

*Strite v. McGinnes,* 330 F.2d 234, 240 (3rd Cir. 1964). See *Peoples Trust Co. v. United States,* 412 F.2d 1156, 1162 (3rd Cir. 1969). According to plaintiff, the court should determine whether there was an ascertainable standard by assessing what restrictions the state law places upon expenditures by an incompetent's guardian. This point of

view, which was adopted in *Gilchrist,* 69 T.C. 5 (1977), contrasts with the weight of precedent which instructs the court to look at the words of the instrument to see whether, under state law, they amount to an ascertainable standard. Taxability is determined by the measure of control which the donee had "by virtue of the grant of power." *Strite .v. McGinnes,* 330 F.2d at 238.

> "In determining what the decedent was *empowered* to do, courts must look to the express *language* of the instrument creating the power, or to the *language* of the instrument as modified by state law."

*Jenkins v. United States,* 428 F.2d 538, 546 (5th Cir. 1970). (emphasis supplied).

The issue to be determined under local law is the nature of the power granted by the donor. The focus is not upon the identity of the particular donee, but, rather, it is upon the language of the instrument of creation.

> "An ascertainable standard must be a *prescribed* standard, not a post-prescriptive course of action. The acting out of the standard is irrelevant, for it is the script rather than the actor which controls a decision concerning the existence of an ascertainable standard."

*Id.* Thus, the relevant question is whether the words employed by the donor, as construed under state law, amount to an ascertainable standard. See *Strite v. McGinnes,* 330 F.2d at 238–239. We need not determine whether a guardian's expenditures are limited by state law as· long as the words of the instrument cannot be interpreted under a state's rules of construction as evoking an ascertainable limitation on the powers of the donee (or on the powers of the donee's guardian).

We find that the power given to Mrs. Brice was not limited by an ascertainable standard.

### E. DID THE DECEDENT DISCLAIM THE POWER OF APPOINTMENT?

Plaintiff's final argument is that the provision in the decedent's will which stated an intention not to exercise any power of ap-

pointment given to her by her husband's will [13] operated as an unequivocal disclaimer since the decedent was incapable of revoking or altering her will because of her incompetency.

If the power was effectively disclaimed by Mrs. Brice, the value of the trust would not be includible in her gross estate. Section 2041(a)(2) provides:

"A disclaimer or renunciation of . . a power of appointment shall not be deemed a release of [the] power."

According to the Regulations:

"The disclaimer or renunciation must be unequivocal and effective under local law. A disclaimer is a complete and unqualified refusal to accept the rights to which one is entitled."

Treas.Regs. § 20.2041–3(d)(6).

Pennsylvania law provides that a power of appointment may be released

"by written instrument signed by the person possessing the power and interest and delivered as hereinafter provided."

Pa.Stat.Ann., Title 20, § 301.3.

Neither the federal estate tax law nor the Pennsylvania statute regarding releases envisioned that a provision in a will—which by its nature is revocable until death—constitutes an adequate disclaimer for purposes of releasing or divesting one's estate of a power of appointment.

■■ Mrs. Brice never released her power to make a will. An adjudication of insanity is not conclusive of testamentary incapacity. *In re Estate of Lanning,* 414 Pa. 313, 200 A.2d 392, 396 (1964); *In re Sterrett's Estate,* 300 Pa. 116, 122, 150 A. 159, 161 (1930). Moreover, the decedent was free at any time prior to her incompetency to alter her will and simply failed to do so. It is of no consequence that Mrs. Brice never regained competency nor that she never wrote a will exercising the power;

**13.** See footnote 2, *supra.*

**14.** 26 U.S.C. § 2053 provides:

"(a) General Rule.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—

§ 2041(a)(2) and the Regulations thereunder do not contemplate that after decedent's death the purported instrument of release will be viewed retrospectively to determine whether there was a satisfactory renunciation.

## II. DEDUCTIBILITY OF PAYMENT OF $75,000 TO HEIRS

The second issue concerns the application of 26 U.S.C. § 2053 which permits an estate to deduct certain administrative expenses.[14] Specifically, the court must determine the deductibility of $75,000 paid to settle a lawsuit brought by the decedent's heirs who were contesting decedent's will.

Robert Lynn Smith, a first cousin of the decedent, filed a "Petition for Citation Sur Appeal from Register in Probating Alleged Will" in the Orphans' Court of Crawford County, Pennsylvania, alleging that Smith and the decedent's other four first cousins were entitled to the estate under Pennsylvania's intestate law. The petition charged that the will "was procured by undue influence, duress and constraint practiced upon the decedent" by her husband, and that the decedent lacked testamentary capacity when she executed the will. A citation was issued joining all interested parties.

The legatees under the will filed an "Answer to Petition for Citation Sur Appeal" denying the allegations concerning incompetency and undue influence. Eventually, after considerable discovery, the will contest litigation was settled by a payment of $15,000 to each of the five first cousins. The total payment constituted less than four percent of the decedent's gross estate.

The executors petitioned the court to approve the compromise agreement and to enter a decree carrying out its provisions. On October 11, 1971, the court entered an order directing the payment of $15,000 to each of the five heirs.

. . . . .

(2) for administration expenses,

. . . .. .

as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered."

The plaintiff has submitted affidavits from the attorney for the estate and the trust officer involved in the decision to settle which aver that the claims were not viewed as meritorious and that the payment was made only to avoid lengthy and costly litigation. On these facts, according to the plaintiff's theory of recovery, the payment is entitled to deductibility as an administrative expense.

Section 20.2053–3(d)(1) of the Regulations states that a deduction is allowed for administrative expenses which are necessarily incurred in preserving and distributing the estate." The plaintiff feels that the regulation encompasses the facts of this case and cites as authority *Estate of Isaac W. Baldwin*, 18 T.C.M. 902, 973–974 (1959).

In *Baldwin*, the decedent was a business partner of his brother. After the decedent died, the brother—who had virtually all the records and information essential to the administration of the estate—refused to cooperate unless a sum of money was paid to him. The executors, although insisting that the brother's claim was baseless, paid the amount demanded, and claimed the amount as an administrative expense under § 2053.

The court allowed the deduction, finding that it would have been impossible to administer the estate until the matter was settled, and that it was probably less expensive to pay the amount then to engage in a prolonged legal battle.

The facts of *Baldwin* are significantly different from those in the instant case. The brother-partner's leverage on the executors resulted from the business relationship he had with the decedent, not from any possible standing he may have had as an heir. It was only coincidental that the person receiving the payment also happened to be the decedent's brother. This factor distinguishes the payments in *Baldwin* from the payments to Mrs. Brice's cousins and removes the instant case from within the perimeter of § 2053.

■ We hold that the payment of $75,000 to the heirs of Mrs. Brice was not deductible as an administrative expense.

The springboard for the cousins' claims was that if Mrs. Brice's will was denied probate the cousins would inherit her considerable fortune. Their status as heirs enabled them to contest the will; had they not been prospective heirs, they would have had no standing to challenge the will. Since their claim emanated from their heirship, the amounts paid to the cousins were sums received through inheritance. *Lyeth v. Hoey*, 305 U.S. 188, 195, 59 S.Ct. 155, 83 L.Ed. 119 (1938). See *Dumont's Estate v. Commissioner of Internal Revenue*, 150 F.2d 691 (3rd Cir. 1945); *In re Sage's Estate*, 122 F.2d 480 (3rd Cir. 1941). In *Dumont's Estate*, the Third Circuit wrote that *Lyeth v. Hoey*

"squarely holds that property received by an heir, under an agreement compromising and settling his contest of his ancestor's will, is property acquired by *inheritance*."

150 F.2d at 693.

The plaintiff has characterized the payment as a "nuisance settlement" and contends that as such it should be treated as an administrative expense rather than as an inheritance.

Had the cousins not been potential inheritors, it is doubtful that they would have been able to command the payment of any significant amount. The dubiousness of the cousins' claim does not avoid the principle of *Lyeth v. Hoey*, which has been applied even where the recipient "had as her only claim the status of a named beneficiary in a prior will." *Dumont's Estate*, 150 F.2d at 693.

In order for an administrative expense to be deductible, it must fall under a definite statutory provision describing it. See *New Colonial Ice Co., Inc. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934); *Edwards v. Phillips*, 373 F.2d 616, 618 (10th Cir. 1967). Section 20.2053–3(d)(1) does not encompass payments made to heirs when the standing for their claims arises from their heirship. Congress has provided no special exception for "nuisance claims." Hence, the amounts paid to Mrs. Brice's first cousins were not deductible as administrative expenses of the estate.

In light of this court's decision on the above issues, we do not reach the additional issues raised by plaintiff regarding the taxation of "flower bonds" and the extent to which attorney's fees are deductible as administrative expenses.

Judgment will be entered for the defendant in an appropriate order.