**Estate of Fannie ALPERSTEIN, Deceased, Rosalind A. Greenberg, Administratrix, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 166, Docket 79–4116.

United States Court of Appeals, Second Circuit.

Argued Oct. 24, 1979.

Decided Dec. 7, 1979.

Albert B. Gins, Boonton, N. J., for petitioner-appellant.

James A. Riedy, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Richard Farber, Attys., Tax Div., Dept. of Justice, Washington, D. C., of counsel), for respondent-appellee.

Before FRIENDLY, OAKES and NEWMAN, Circuit Judges.

FRIENDLY, Circuit Judge:

Rosalind A. Greenberg, executrix of the estate of Fannie Alperstein, filed a petition in the Tax Court seeking redetermination of a deficiency in federal estate tax asserted by the Commissioner of Internal Revenue. Certain other issues having been settled, the sole question left for determination by the Tax Court was whether the Commissioner was correct in asserting that the decedent possessed a general power of appointment within the meaning of I.R.C. § 2041(a)(2) over the corpus of a trust established for her benefit in her husband's will. Chief Judge Featherston ruled in favor of the Commissioner and the estate has appealed. We affirm.

The facts have been stipulated. Fannie Alperstein died intestate on December 3, 1972, after surviving her husband, Harry, who had died more than five years earlier on July 6, 1967. His will established a trust for the benefit of the decedent which was to contain the maximum portion of his adjusted gross estate that was allowable as a marital deduction, I.R.C. § 2056. Fannie Alperstein was to receive all the net income from the trust payable at frequent intervals for the duration of her life, and was granted a testamentary power to appoint the principal of the trust free of any restrictions.[1] If the decedent failed to exercise her testamentary power of appointment, Mr. Alperstein's children or their issue would take in default.

On January 16, some six months before Harry Alperstein's death, Fannie Alperstein had entered a nursing home where she remained until shortly before her death. On December 27, 1967, a New York court de-

---

1. In relevant part, Article Fourth of Mr. Alperstein's will provided:

    If my wife, FANNIE ALPERSTEIN, shall survive me, I give and bequeath unto my Trustees hereinafter named an amount equal to the difference between (a) one-half of the value of my adjusted gross estate and (b) the value of all property passing to my said wife under any other article or articles of this, my Will, or otherwise, and with respect to which a marital deduction is allowable to my estate under the provisions of the United States Internal Revenue Code, Section 812(e); my said Trustees shall hold the sum so bequeathed to them, IN TRUST, to pay to my said wife all the net income therefrom quarter-annually or at more frequent intervals during her life, and *upon her death she shall have the power by her last Will and Testament to appoint the entire principal of this trust fund then remaining in the hands of my said Trustees to her estate, free of any trust, or to or in trust for the benefit of anyone else.* [Emphasis added.]

clared Fannie to be incompetent and appointed her daughter, Rosalind A. Greenberg, to manage her person and property. Although the judicial determination of the decedent's incompetence followed the death of Mr. Alperstein by almost six months, the parties have stipulated that from her husband's death until her own death, the decedent lacked the capacity to execute a will under New York law, did not purport to exercise the power of appointment granted by her husband's will, and was legally incapable of exercising that power.

Rosalind A. Greenberg, the decedent's executrix, filed a federal estate tax return that did not include in the decedent's gross estate the value of the property over which, the decedent had been granted testamentary power of appointment by her husband's will. The Commissioner asserted a deficiency based on his determination that the decedent possessed at death a general power of appointment within the meaning of I.R.C. § 2041(a)(2), which required the inclusion of the entire value of the property subject to that power within her gross estate. The parties have stipulated that if the property subject to the power created by Mr. Alperstein's will is included in the decedent's gross estate, that property is to be valued at $242,167.17.

In relevant part, I.R.C. § 2041 provides:
(a) . . . The value of the gross estate shall include the value of all property—

*    *    *    *    *    *

(2) . . . [W]ith respect to which the decedent has at the time of his death a general power of appointment created after October 21, 1942 . . . .. For purposes of this paragraph (2), the power of appointment shall be considered to exist on the date of the decedent's death . . . ., whether or not . . . the power has been exercised.

*    *    *    *    *    *

(b) *Definitions.*—For purposes of subsection (a)—

(1) . . . The term "general power of appointment" means a power which is exercisable in favor of the decedent, his estate, his creditors, or the creditors of his estate . . .

Appellant does not question that, so far as language is concerned, the power of appointment conferred by Article Fourth of Harry Alperstein's will, see note 1 *supra*, met the statutory test. The claim is that, despite this § 2041(a)(2) is inapplicable because, under the stipulated facts, Fannie Alperstein was never able after her husband's death to exercise the power vested in her by his will—a situation allegedly not present in any of the cases that have sustained the taxability of powers against attacks of the same general sort as that mounted here.[2]

I.

We start, as always, with the words of the statute. *F.T.C. v. Bunte Brothers, Inc.*, 312 U.S. 349, 350, 61 S.Ct. 580, 85 L.Ed. 881 (1941). The operative verb in § 2041(a)(2) is "has". Beyond cavil Mrs. Alperstein "had" a general power of appointment at the time of her death. This had been granted by her husband's will and nothing done by the New York courts purported to take it away. Even if we assume that the judgment of Fannie Alperstein's incompetency conclusively established her inability to exercise

---

**2.** In fact Mrs. Alperstein's inability ever to have exercised the power is not so clear as appellant's counsel asserts. Harry Alperstein's will was executed on September 23, 1953. This stipulation that Mrs. Alperstein was incompetent to execute a valid will after her husband's death on July 6, 1967, does not negate her capacity to have exercised the power prior to his death. Absent contrary specification by the donor, New York law does not require the donee of a testamentary power to provide for its exercise in a will executed subsequent to the donor's death. See N.Y.Est., Powers & Trusts Law § 10–6.1 (McKinney). Indeed, Mrs. Alperstein could have exercised the power by a will made even before Harry's will was executed. *See, e. g., In re Tucker's Trust*, 41 Misc.2d 405, 244 N.Y.S.2d 356 (S.Ct.1963); *In re Thorne's Trust*, 9 Misc.2d 126, 167 N.Y.S.2d 211 (S.Ct. 1957), *aff'd*, 6 A.D.2d 783, 175 N.Y.S.2d 559 (1958), *aff'd*, 6 N.Y.2d 967, 191 N.Y.S.2d 165, 161 N.E.2d 391 (1959). However, we do not find it necessary to rest decision on this ground.

this power, that judgment was subject to being vacated if her mental condition changed for the better. The argument is rather that although Mrs. Alperstein "had" such a power, it was not "exercisable" at the time of her death since she had long since been declared incompetent and in fact had been so ever since her husband had died. However, the word "exercisable" is found not in the operative portion of the statute but in a section addressed to how broad a power must be in order to be "general". The natural meaning of the words is that "exercisable" is shorthand for "which by its terms may be exercised," and not that § 2041(a)(2) is limited to cases where the decedent could in fact exercise the power at the moment of death—something which, in the absence of a previous will or similar instrument, could rarely occur.

## II.

The meaning which thus emerges from the words of the statute is strongly reinforced by the legislative history. Section 2041 reflects, in all respects here relevant, the Powers of Appointment Act of 1951, 65 Stat. 91. The latter was a substantial amendment of the amendments to § 811 of the Internal Revenue Code of 1939 that were included in the Revenue Act of 1942, 56 Stat. 798, 942.

Prior to the 1942 legislation, estate taxation of powers of appointment had remained substantially unchanged since § 402 of the Revenue Act of 1918, 40 Stat. 1057, 1097, first imposed a federal estate tax on appointed property. Under pre-1942 law, such property was taxed "only if (1) the [decedent's appointive] power was general, (2) the power was exercised, and (3) the appointive property passed as a result of such exercise." Craven, Powers of Appointment Act of 1951, 65 Harv.L.Rev. 55, 55–56 (1951). The 1942 amendments dramatically altered this policy in response to a widespread belief that it had served as "an outstanding device for the avoidance of estate tax." S.Rep. No. 1631, 77th Cong., 2d Sess. 232 (1942). Dissatisfaction with the pre-1942 law by those interested in protect-

ing the revenue focused on the opportunities it afforded to avoid taxation, either through deliberately failing to exercise a general power of appointment (in effect, retaining the power to choose other appointees by deciding in favor of the takers-in-default) or through eluding court-fashioned definitions of "general" powers of appointment with the aid of minor restrictions that transmuted a general power into an exempt "special" power. See, e. g., Griswold, Powers of Appointment and the Federal Estate Tax, 52 Harv.L.Rev. 929 (1939); statement of Randolph E. Paul, Tax Adviser to Secretary of the Treasury, Hearings before Comm. on Ways and Means on Revenue Revision of 1942, 77th Cong., 2d Sess. 91 (1942). Both loopholes were plugged by the 1942 amendments, which taxed all powers of appointment created after the enactment of the amendments regardless of whether they were exercised, save for those powers that could only be exercised in favor of certain restricted classes of potential appointees. See 1942 amendments, *supra*, at § 403(a). In addition, the 1942 amendments fixed the time of death as the relevant moment for determining the existence of a taxable power. *Id.* § 403(a). Powers that lapsed prior to the decedent's death were treated as taxable releases by the post-1942 estate and gift tax regulations. See U.S. Treas. Reg. 105, § 81.24(b)(1) (1943); U.S. Treas. Reg. 108, § 96.2(b) (1943).

The 1942 amendments extended the policy of taxing powers, regardless of exercise, to general powers created before the enactment of the amendments. See 1942 amendments, *supra*, § 403(d)(1). However, the amendments sought to mitigate the retroactive impact of this by allowing a grace period in which all holders of general powers might release their power without estate tax consequences, *id.* § 403(d)(3), and by extending this grace period in the case of holders who were "under a legal disability to release such power" until six months after the termination of their disability, *id.* § 403(d)(2). Wartime military personnel were expressly included as beneficiaries of the legal disability grace period; the inclusion of other beneficiaries was to be deter-

mined in accordance with local law. *Id.* Senate Report No. 1631, *supra,* suggested that legal incompetents such as insane people, minors, and unborn children might be expected to benefit from this exemption. *Id.* at 234. Beyond demonstrating that when Congress wished to make a dispensation for incompetents, it has known how to say so, the fact that the 1942 Congress felt it necessary to include this provision strongly suggests its belief that the existence of a legal disability by the holder of a general power would not prevent inclusion of property subject to that power in the estate. Although the provision in question related only to pre-1942 powers, there is no reason to suppose that Congress intended a different rule with respect to incompetency for post-1942 powers.

Until the 1951 Act, Congress extended taxpayer deadlines for releasing pre-1942 powers on numerous occasions, see Craven, *supra,* at 60, but left the treatment of post-1942 powers unchanged. In the case of pre-1942 powers, the 1951 Act returned to the criterion of pre-1942 law by taxing only those general powers that had been exercised. 1951 Act, *supra,* § 2(a). However, the 1951 Act continued the policy of taxing post-1942 general powers regardless of their exercise, and its legislative history contains no indication that Congress intended to alter the treatment of legally disabled holders of post-1942 powers. To the extent that the 1951 Act dealt more liberally than its predecessor with post-1942 powers, it did so only by shrinking the class of taxable powers to those that fall within its definition of "general powers"—a definition that looks primarily to the terms of the trust instrument and not at all to the status of the donee of the power.

This conclusion is also buttressed by one of the Act's broader purposes, namely, to provide "a test of taxability which is simple, clear-cut, and easy to apply." S.Rep. No. 382, 82d Cong., 1st Sess. 2, [1951] U.S.Code Cong. & Admin.News, pp. 1530, 1531. Linking an interpretation of "exercisable" to decedents' disabilities under local law would hardly simplify the 1951 test, particularly since the Act provides no basis for distinguishing decedents adjudged to be legally incompetent from those who were otherwise barred from exercising their powers.

We find no force in the contrary argument that Congress' concern in 1951 for those holders of pre-1942 powers who are "unwary" or "powerless to help themselves," S.Rep. No. 382, *supra,* [1951] U.S. Code Cong. & Admin.News at 1531, which led to a change from the policy of the 1942 Act with respect to such powers, may allow the courts to manifest a similar concern for holders of post-1942 powers. See Note, Federal Estate Tax: A Possible Exception in the Application of I.R.C. Section 2041 to Testamentary Powers of Appointment Held by Incompetent Decedents, 1977 Brigham Young U.L.Rev. 644, 659 (1977); cf. *Estate of Bagley v. United States,* 443 F.2d 1266, 1272 (5 Cir. 1971) (Ainsworth, J., dissenting). This position ignores the strict division between pre- and post-1942 powers which is at the heart of the 1951 Act.

Further support for the construction that the 1951 Act embraced all general powers regardless of the donee's capacity to exercise them is furnished by a provision in the marital deduction, originally enacted by § 361(a) of the Revenue Act of 1948 and now codified as amended in I.R.C. § 2056(b)(5). This provides that property passing in trust to a surviving spouse will qualify for exclusion from the decedent's estate, *inter alia,* if the surviving spouse is entitled to all income from the property for life; if the surviving spouse has the power to appoint such property in favor of herself or the estate; and if the power to appoint such property, "whether exercisable by will or during life, is exercisable by such spouse alone and in all events." The Internal Revenue Service has long held that competency under local law is irrelevant for determining whether a power is "exercisable" within the meaning of the marital deduction. Rev. Rul. 55–518, 1955–2 Cum.Bull. 384; Rev. Rul. 75–350, 1975–2 Cum.Bull. 367. This conclusion is virtually dictated by the consideration that "[o]therwise, in view of the possibility that any given person may become legally incompetent during his or her

lifetime, no trust could ever qualify under section 2056(b)(5)." Rev.Rul. 75–350, *supra*, 1975–2 Cum.Bull. at 368. The implication of accepting this most sensible construction of "exercisable" in the marital deduction context is that at the time the 1951 Powers of Appointment Act was passed, a determinant legislative meaning as to what constitutes an "exercisable" power of appointment already existed in both the powers of appointment and marital deduction provisions of the Code. Still more persuasive is the evidence that Congress intended the marital deduction as a deferral of tax on property which, however, would eventually be subject to a gift or an estate tax paid by the surviving spouse or by her estate. See S.Rep. No. 1013, 80th Cong., 2d Sess. 16, [1948] U.S.Code Cong. & Admin.News, pp. 1163, 1238; *Northeastern Nat'l Bank v. United States*, 387 U.S. 213, 221, 87 S.Ct. 1573, 1578, 18 L.Ed.2d 726 (1967) ("Congress' intent to afford a liberal 'estate-splitting' possibility to married couples, where the deductible half of the decedent's estate would ultimately—if not consumed—be taxable in the estate of the survivor, is unmistakable.") *United States v. Stapf*, 375 U.S. 118, 128, 84 S.Ct. 248, 11 L.Ed.2d 195 (1963) (purpose of marital deduction to tax married couples in stages but not to permit tax-exempt transfers into succeeding generations). Given that this purpose was served in 1948 by adopting the same use of "exercisable" in the marital deduction that already existed in the corresponding powers of appointment provision, Congress cannot be thought to have abandoned *sub silentio* the intended interaction between these two provisions a mere three years later and thereby to have created a situation, such as concededly would exist here if appellant were to prevail, wherein property escapes estate tax at the time of the death of the donor of the power because the competency of the donee is immaterial and also at the time of the death of the donee because competency is held to be

crucial. The 1951 Powers of Appointment Act must be read not in isolation but as a part of a comprehensive statutory scheme.[3]

### III.

We find no basis for a contrary view in the Service's rulings and regulations.

The Service first addressed the relationship between incompetency and § 2041(a)(2) in Rev.Rul. 55–518, 1955–2 Cum.Bull. 384 (1955), which ruled on the estate of a surviving spouse who had enjoyed an unrestricted lifetime power of appointment over a testamentary trust created by her husband. In a dual holding, the Service determined that the husband's estate qualified for a marital deduction and the wife's estate was taxable for her power even though the wife was incompetent from the date of her husband's death until the time of her own death. *Id.* 385. The Service reasoned that the wife could have exercised her power with the aid of a local court and, therefore, "possessed" the power at the time of her death even if she could not have freely exercised it at any time. *Id.*

A more general statement regarding incompetency entered the Proposed Rule Making of October 16, 1956, the first step in the Service's attempt to overhaul the estate tax regulations after the enactment of the Internal Revenue Code of 1954. Section 20.2041–3(b) of the proposed regulations, 21 F.R. 7850, 7883 (1956), provided:

> [A] power of appointment is considered to exist on the date of the decedent's death even though the decedent was at death and at all times since the creation of the power under physical, mental, or legal disability (whether or not adjudged incompetent).

Yet—and this point is strongly pressed by appellant—the final Estate Tax Regulations, which were promulgated on June 24, 1958 and are still in effect, deleted all mention of "physical, mental, or legal disability" from § 20.2041–3(b), while otherwise adopt-

---

**3.** We recognize that a general power of appointment can be conferred in context other than a marital deduction trust. However, now that property subject to such a power is taxa-ble to the estate of the donee, use of the general power in the marital deduction trust must be far and away the principal one.

ing the language of the proposed regulation *in toto*. 1958–2 Cum.Bull. 432, 528 (1958).

The Service offered no contemporaneous explanation for its decision to drop the disability language from its final regulations. However, persuasive support exists for the Government's contention that the disabilities sentence was dropped because it was thought to conflict with—or at least to seem to conflict with—the Service's provisional position on powers of appointment in the gift tax area. See *Pennsylvania Bank and Trust Co. v. United States*, 597 F.2d 382, 383 (3 Cir. 1979). Less than three months after the publication of the proposed estate tax regulations, the Service issued proposed regulations on the taxation of gifts made after 1954. Section 25.2503–4 of the proposed gift tax regulations detailed the circumstances under which transfers to minors would satisfy the conditions of I.R.C. § 2503(c), and hence qualify as gifts of a "present interest" meriting the $3,000 gift exclusion available under I.R.C. § 2503(b). Proposed regulation § 25.2503–4 would have denied present interest treatment to property transferred by donating a power of appointment to a minor if that power was qualified by substantive restrictions, including any restrictions imposed by local law on the minor's ability to exercise a power. Thus, unlike the proposed estate tax regulations, the proposed gift tax regulations seemed to make the "exercisability" of a power under local law into a critical requisite for its possession. Ironically, however, in the final gift tax regulations promulgated on November 15, 1958, the Service reversed itself on the disqualifying effect of legal restrictions on a minor's ability to exercise a power of appointment. The final § 25.2503–4(b) stated:

> if the minor is given a power of appointment . . ., the fact that under local law a minor is under a disability to exercise an inter vivos power or to execute a will does not cause the transfer to fail to satisfy the conditions of section 2502(c) [2503(c)].

It seems plausible, then, that the inconsistency between the treatment of legal disabilities under the proposed gift and estate tax regulations led the Service to withdraw its disability language from the final estate tax regulations while reconsideration of the disability issue under the gift tax regulations was still pending. Ultimately, the stance toward legal disabilities adopted in the treatment of gifts to minors was consistent with that originally proposed for the treatment of powers of appointment in the estate tax area. By this time, however, the final estate tax regulations had already been promulgated.

Even if this explanation should not be accepted, the most that can be said of the withdrawal of the legal disability language in the proposed regulations is that the Service decided to leave the issue of the effect of incompetency for subsequent consideration by itself and ultimately by the courts. Despite the deletion of the disability language from the regulation, the Service has never withdrawn from the position it originally expressed in Rev.Rul. 55–518, discussed above. Rev.Rul. 74–350, 1975–2 Cum.Bull. 367, the Service's most recent pronouncement on the relationship between incompetency and the possession of a general power within the meaning of § 2041, extends the Service's original determination of taxability to a legally incompetent holder of a testamentary power who is indistinguishable from Mrs. Alperstein in all relevant respects. This ruling abandons any reliance on the possibility that a legally incompetent holder of a power might be able to exercise his power with the aid of a court or anyone else. Instead, it concludes:

> [j]ust as incapacity or incompetency does not render property owned outright by a decedent exempt from estate taxation, neither is property subject to a general power of appointment exempt in such circumstances, unless *by the terms of the grant of the power* such circumstances have caused the existence of the power itself to cease prior to the decedent's death. [Emphasis original.]

*Id.* at 368.

## IV.

Although appellant may be right in contending that no decision upholding the es-

tate taxation of property subject to a general power of appointment has presented facts quite so humanly appealing in favor of the donee as this, the general thrust of the case law in appellate courts is decidedly unfavorable to her.

While the Supreme Court has not had occasion to rule on the effect of incompetency of the holder of a general power on taxability under § 2041, *C.I.R. v. Estate of Noel*, 380 U.S. 678, 85 S.Ct. 1238, 14 L.Ed.2d 159 (1965), strongly indicated the Court's probable approach. *Noel* required a construction of I.R.C. § 2042, which provides *inter alia* that a decedent's estate is taxable for the proceeds of insurance policies on the life of the decedent "with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable alone or in conjunction with any other person." Immediately before boarding a plane doomed to a fatal crash, the decedent in *Noel* purchased several flight insurance policies which he left with his wife on the ground. The decedent's estate contended that on these facts there had been no exercisable incidents of ownership within the meaning of the statute. While acknowledging that "there was no practical opportunity" to exercise ownership power, the Court concluded:

It would stretch the imagination to think that Congress intended to measure estate tax liability by an individual's fluctuating, day-to-day, hour-by-hour capacity to dispose of property which he owns. We hold that estate tax liability for policies "with respect to which the decedent possessed at his death any of the incidents of ownership" depends on a general, legal power to exercise ownership, without regard to the owner's ability to exercise it at a particular moment.

*Id.* at 684.

Three courts of appeals have considered the effect upon taxability under § 2041 of the inability of the holder of a power to exercise it; all have ruled in favor of the Government. In *Fish v. United States*, 432 F.2d 1278 (9 Cir. 1970), a surviving spouse received a non-cumulative power of appointment over the annual income from a trust corpus, which, if not exercised, lapsed at the conclusion of each year in which it was payable. The decedent's estate argued that her incompetence during the final years of her life rendered the periodic lapses of her power during those years outside the scope of § 2041(b)(2) (and thus not releases that were taxable to the decedent's gross estate). The Ninth Circuit concluded:

The precise manner of exercising or releasing the power is immaterial for purposes of determining taxability. Thus it is sufficient here that the power was released by its annual expiration . . . and it is immaterial whether the lapse occurred through a designed failure to exercise the power or through the indifference or incompetency of the decedent. [Citations omitted.]

*Id.* 1280. In a footnote, the *Fish* court observed that any different result "would be an open invitation to contest the competency of the decedent in every similar case," but also noted, in a remark on which appellant relies as a basis for distinction, that the *Fish* decedent had never been adjudicated to be incompetent before her death. *Id.* 1280 n.3.

The *Fish* decision was followed by *Estate of Bagley v. United States*, 433 F.2d 1266 (5 Cir. 1971) (Wisdom, Bell, and Ainsworth, C. JJ.). In *Bagley*, a husband's will vested a testamentary power of appointment in his wife. The same will also provided that in the event of the simultaneous death of husband and wife, the wife should be deemed the survivor. Two days following the execution of the will, the couple died in an automobile accident, and a state court entered a decree honoring the will's simultaneous death provision. The *Bagley* majority (per Bell, J.) held that the wife had survived her husband for a "theoretical instant" during which her power of appointment had been exercisable within the meaning of § 2041(a)(2) and, moreover, that she had possessed the power granted by her husband's will under state law even though the will had not been probated at the time of her death. *Id.* 1269–70. Dissenting,

Judge Ainsworth stressed the absence of any indication that the decedent knew of the power created by her husband's will.

Most relevant and persuasive of all is the recent decision in *Pennsylvania Bank and Trust Co. v. United States*, 597 F.2d 382 (3 Cir. 1979), aff'g, 451 F.Supp. 1296 (W.D.Pa. 1978). Under a 1956 will of her husband who died on February 9, 1965, Ethel S. Brice was given "the right during her life to consume or appoint by Will . . . the entire principal of this Trust." Pursuant to a petition executed on February 12, 1965, Mrs. Brice was adjudicated an incompetent. It was undisputed that she had been incompetent since April 1960 and remained so until her death in August 1969; in her 1959 will she declined to exercise any powers of appointment. A carefully considered opinion by District Judge Marsh, unanimously affirmed by the Court of Appeals, held that the property subject to the power was taxable as part of Mrs. Brice's estate, essentially for reasons such as those heretofore developed in this opinion. Appellant's sole distinction of the *Pennsylvania Trust* case, which counsel also contends to have been wrongly decided, is that Mrs. Brice's guardian could have directed that all the property in the trust be consumed on her behalf. We do not consider the distinction to be sufficient. The property was held taxable in Mrs. Brice's estate because at the time of her death she had a general power of appointment over it; the court considered the possibility of diversion of the property to her during her life only in rejecting the estate's claim that this brought the case within § 2041(b)(1)(A) which says that a

> power to consume, invade, or appropriate property for the benefit of the decedent which is limited by an ascertainable standard relating to the health, education, support, or maintenance of the decedent

shall not be deemed a general power of appointment.

See 451 F.Supp. at 1302.[4]

Against this array of unfavorable decisions by the Supreme Court and courts of appeals, all of which emphasize the creation of rights and pay scant regard to the possibility of their exercise, taxpayer relies on four recent decisions of courts of first instance that are now under appeal to the Court of Appeals for the Fifth Circuit: *Finley v. United States*, 404 F.Supp. 200 (S.D. Fla.1975); *Estate of Gilchrist v. C.I.R.*, 65 T.C. 5 (1977); *Williams v. United States*, 78–2 U.S.T.C. ¶ 13,264 (W.D.Texas, 1978); and *Estate of Reid v. C.I.R.*, 71 T.C. 816 (1979). Whether correctly decided or not, *Gilchrist* is readily distinguishable; it dealt not with a testamentary power of appointment but with a clause conferring on the widow "full rights to transfer all the remainder of my property, both real and personal, so long as she may live." The court held that under Texas law the appointment of guardians transformed, for the period of incompetency, Mrs. Gilchrist's general power over corpus to one limited by an ascertainable standard within § 2401(b)(1), 69 T.C. at 15–19. *Estate of Reid*, which relies heavily on *Gilchrist*, is even more remote from the instant case, as it deals with the effect of legal incompetence on taxation under I.R.C. § 2036(a)(2). In our view, *Finley* and, if the decedent in *Williams* possessed a testamentary power of appointment, that case also, were wrongly decided.

In sum we hold, on the basis of statutory language, legislative history (particularly the interaction of § 2041(a)(1) with the marital deduction, § 2056(b)(5)), administrative interpretation and case law, that when an instrument has conferred a testamentary power which by its terms can be exercised in favor of the donee's estate, the property subject to the power is part of the donee's gross estate even though the donee, by vir-

---

4. Two other court of appeals decisions rejecting claims that incompetency of the holder of the power permitted escape from taxation under I.R.C. § 2036 and § 2038, and their pre-1954 predecessors, § 811(c) and § 811(d) of the Code of 1939, which extend the estate tax to trans-

fers made by trust or otherwise over which the decedent-donor retains certain enumerated powers, deserve citation: *Hurd v. C.I.R.*, 160 F.2d 610 (1 Cir. 1947); *Round v. C.I.R.*, 322 F.2d 590 (1 Cir. 1964).

tue of incompetency, was unable to make a valid will at any time after the power was granted.

Affirmed.