James P. NAUGHTON, Individually and as guardian ad litem of Timothy Naughton, Timothy Naughton, Plaintiffs,

v.

Dr. Joseph BEVILACQUA, Director of the Department of Mental Health, Retardation and Hospitals of the State of Rhode Island and Dr. Gerald John Bannash, State of Rhode Island, Defendants.

Civ. A. No. 77–0313.

United States District Court,
D. Rhode Island.

Sept. 18, 1978.

George M. Prescott, Lincoln, R. I., for plaintiffs.

Forest Avila, Sp. Asst. Atty. Gen., Dennis J. Roberts, II, Providence, R. I., for defendants.

## OPINION AND ORDER

PETTINE, Chief Judge.

Plaintiffs Timothy Naughton and his father bring this action against Dr. Joseph Bevilacqua, Director of the Department of Mental Health, Retardation and Hospitals ("MHRH") for the State of Rhode Island, against Dr. Gerald Bannash, a physician employed by MHRH, and against the State of Rhode Island, as their employer, for permanent injunctive relief and damages. Defendants' motion for summary judgment is before the Court for final decision following further briefs and limited discovery permitted by the Court's orders of July 26 and June 5, 1978.

Plaintiff Timothy Naughton, now aged twenty, has been diagnosed as moderately mentally retarded and suffering from childhood schizophrenia. In 1972, he was voluntarily committed to the Rhode Island Institute of Mental Health ("IMH") operated by MHRH, where he presently resides in the Multihandicapped Unit.

This litigation arises from injuries Timothy suffered allegedly in reaction to medication prescribed and administered by defendant Bannash on May 20, 1977. The medication, Prolixin, belongs to the family of major tranquilizers known as phenothiazines that are commonly prescribed to control psychotic symptoms afflicting the mentally ill. According to the Complaint, in reaction to Prolixin on May 20, Timothy suffered convulsive spasms and hemorrhaging.

On a number of previous occasions, it is alleged, Timothy has suffered serious adverse reactions to other phenothiazines. Timothy's sensitivity to phenothiazines was noted several times in the permanent case record, and, according to the Second Amended Complaint, communicated to the staff of IMH by Timothy's parents. The record at the nurse's station on the floor where Timothy resides indicated only his sensitivity to Haldol, another tranquilizer in the phenothiazine family.

Following the May 20 incident, Dr. John Karkalas, Chief of Psychiatric Services at IMH, ordered that a warning notice of Timothy's sensitivity to phenothiazines be placed on all records, including at the nurses' station. In addition, no tranquilizing medication was to be prescribed without prior notice and approval by Dr. Karkalas' office.

## I. Cause of Action

Plaintiffs bring this action pursuant to 42 U.S.C. sec. 1983 to permanently enjoin and recover damages for alleged violations of rights secured by the Constitution and by the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. sec. 6001 et seq. (1975) ("Act"). Jurisdiction is premised upon 28 U.S.C. secs. 1331, 1343. In essence, plaintiffs make two distinct constitutional claims—a right to treatment and a right to "a basically humane and safe living environment". Harper v. Cserr, 544 F.2d 1121, 1124 (1st Cir. 1976). Plaintiffs also claim a violation of a statutory right to "appropriate treatment" secured by the Act, 42 U.S.C. sec. 6010, and remedied through either an implied cause of action or sec. 1983.

The Court's June 5, 1978 opinion and order attempted to articulate the substantive parameters of both the statutory claim and the constitutional right to a humane environment. Based on congressional intent in the former and decisional precedent in this Circuit in the latter, Harper v. Cserr, 544 F.2d 1121, this Court excluded actions that were tantamount to negligent malpractice, at least on the individual rather than class-based, institution-wide level. On the constitutional side, to "cross the line from tort to a sec. 1983 case stating a claim under the eighth amendment or possibly even the due process clause of the fourteenth", plaintiffs must establish "a sufficient combination of helplessness on the part of [the patient], and wanton callousness on the part of those caring for her . . . ." Harper v. Cserr, 544 F.2d at 1124. This Court reserved judgment on the constitutional claim to permit discovery of the medical records. On the statutory side, the thrust of the factual allegations indicated only a negligent fail-

ure to test for Timothy's special sensitivity to Prolixin, in light of his allergy to other phenothiazines, and prescribe accordingly. So viewed, these facts did not implicate Timothy's "right to appropriate treatment, services and habilitation", 42 U.S.C. sec. 6010(1), which "should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty". 42 U.S.C. sec. 6010(2). Nor did these facts come within the statutory prohibition of "excessive use of chemical restraints on such persons and the use of such restraints as punishment or as a substitute for a habilitation program or in quantities that interfere with services, treatment or habilitation for such persons", 42 U.S.C. sec. 6010(3). The only reason emerging from the First-Amended Complaint that rendered prescription of Prolixin inappropriate or excessive was Timothy's special sensitivity to phenothiazines. The Court did not reach either the issue of whether these rights were judicially enforceable through a private cause of action or whether the particular defendants could be sued.

### A. Statutory Claim

■ Based on further allegations and more refined legal and medical discussion, however, the Court finds that plaintiffs have alleged facts which, if proved, would constitute a violation of the statutory "right to appropriate treatment" and "habilitation". The Court does not alter its initial reasoning that if Timothy's injuries were caused simply by, for example, a negligent failure to test Timothy's sensitivity to Prolixin, or a negligent failure to check

or update the relevant medical records, no statutory right has been violated. A tort action in state court for malpractice remains a perfectly adequate remedy. However, plaintiffs now suggest that Timothy's reactions, although severe, are not properly characterized as an atypical allergy but rather are well-known side-effects of Prolixin. If the drug was administered fully aware of the particular and general dangers to Timothy but in a calculated effort to control his behavior without any habilitative purpose, the statutory concern that developmentally disabled persons receive only "appropriate" treatment would be indeed implicated.

■ The statutory language and legislative history support the Court's conclusion that the statutory right of the developmentally disabled individual protects only against treatment that is unnecessarily restrictive or without habilitative purpose, and not against merely negligent treatment. The Report of the Senate Committee on Labor and Public Welfare signalled the new vision and direction the Act intended in treatment of the mentally retarded or "developmentally disabled".[1] Past attitudes toward the developmentally disabled had resulted in curtailment of human and legal rights. The Act displaces these attitudes—that these persons were "sub-human organisms lacking in sensitivity", that they were a "threat" to society, that they were "eternal children" or "diseased"—with the recognition that the developmentally disabled have potential for growth and learning. S.Rep. No. 94–160, 94th Cong. 1st Sess. 27–28 (May 22, 1975). Consistent with this new model, the statute calls for habilitation plans that are geared toward devel-

---

1. "Developmental disability" is defined as a disability which:

(A)(i) is attributable to mental retardation, cerebral palsy, epilepsy, or autism;
(ii) is attributable to any other condition of a person found to be closely related to mental retardation because such condition results in similar impairment of general intellectual functioning or adaptive behavior to that of mentally retarded persons or requires treatment and services similar to those required for such persons, or

(iii) is attributable to dyslexia resulting from a disability described in clause (i) or (ii) of this subparagraph;
(B) originates before such person attains age eighteen;
(C) has continued or can be expected to continue indefinitely; and
(D) constitutes a substantial handicap to such person's ability to function normally in society. 42 U.S.C. sec. 6001(7).

oping the individual's potential to its maximum in the most normal or least restrictive environment feasible. The legislation emphasizes deinstitutionalization or alternative programs that permit residence in the community. In sum, institutional care, where absolutely necessary, must be habilitative rather than merely custodial. The Senate version of the legislation also detailed standards of care and treatment and compliance mechanisms to assure the quality of programs receiving federal funds. However, the version ultimately adopted expressly eliminated the Senate's detailed quality standards, leaving the Secretary of Health, Education and Welfare to further study and report to Congress on the proper standards. The Conference Committee did, however, firmly adopt the Senate's "bill of rights" which secures the "right to receive appropriate treatment for the conditions for which they are institutionalized". H. Conf. Rep. No. 94–473, 94th Cong. 1st Sess. 42; [1975] U.S.Code Cong. & Admin. News, pp. 919, 961.

■ Consistent with the legislation's primary focus on the nature of the treatment and not the quality, an isolated incident of negligent treatment, addressing the quality of care toward that individual, is not within the statute's concern. "Appropriate" is not synonymous with "non-negligent" or "adequate". But where that treatment is not inadvertent but reflects a decision to control or simply maintain rather than to "maximize the developmental potential", 42 U.S.C. sec. 6010(2), with the concomitant unnecessary restriction on physical or psychic liberty, the core guarantees of the Act's bill of rights are violated. For example, Congress' concern reaches a mentally retarded child who is housed with and treated as the mentally ill, a mildly retarded child who can function with proper training in a non-institutional setting but who is housed with and treated as the most profoundly retarded, or a retarded child who is so sedated as to impede all functioning merely as a convenient means of controlling troublesome behavior. Timothy's case is not as clear-cut as these examples because of the significant, complicating factor that he has been diagnosed as a schizophrenic, as well as moderately retarded. The emotional condition might justify the use of phenothiazines in circumstances otherwise inappropriate. But, at this early stage in discovery, the Court cannot categorically hold that plaintiffs could not possibly establish, in light of the allegations of repeated notice and repeated administration of phenothiazines with consequent ill effects, that the administration of Prolixin was part of a deliberate treatment plan designed merely to control rather than habilitate.

■ In addition to finding that Timothy has stated facts that could establish a violation of the statutory right, the Court holds that such violations can be remedied through a private cause of action. In harmony with the language of sec. 1983,[2] courts have made no distinction between redress of rights secured by the Constitution and those secured by federal statutory law.

See *Hagans v. Lavine*, 415 U.S. 528, 535, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Lynch v. Household Finance Corp.*, 405 U.S. 538, 543 n. 7, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972); *Greenwood v. Peacock*, 384 U.S. 808, 829–830, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966); *Blue v. Craig*, 505 F.2d 830, 834–836 (4th Cir. 1974); *Gomez v. Florida State Employment Service*, 417 F.2d 569 (5th Cir. 1969). *Cf. Randall v. Goldmark*, 495 F.2d 356, 359 (1st Cir. 1974).

**2.** Sec. 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Controversy has centered not on whether sec. 1983 provides a cause of action for violation of statutory rights but whether 28 U.S.C. sec. 1343 supplies jurisdiction. Since the jurisdictional amount appears satisfied in the instant suit, sec. 1331 serves as the jurisdictional basis.

Since the statutory right is expressly cast in the nature of a civil right secured by a statutory provision denominated a "bill of rights", sec. 1983 is a particularly appropriate vehicle, provided, as here, suit is brought against officials and employees of a facility with significant state involvement. *Downs v. Sawtelle,* 574 F.2d 1 (1st Cir. 1978). Indeed, the statutory right is kin to the constitutional right to treatment recognized by several courts cited by the Senate Committee. S.Rep. *supra,* at 28–29.

▆▆▆ The legislative scheme and history indicate that Congress intended this statutory right to be enforceable through individual private actions in the judicial as well as administrative forum. The Conference Committee added the Senate's bill of rights to the House bill that had provided only for incentive to improve programs in states though the provision or withholding of federal funds. This addition is codified in sec. 6010, which initially declares the right to appropriate treatment of all developmentally disabled and separately provides that federal funds are available only to programs that meet certain basic minimum standards and offer "appropriate" treatment. This dichotomy in sec. 6010 suggests that denial of funds is not the only mechanism to enforce the declared statutory rights. Moreover, the Conference Report explicitly states that "this right [to receive appropriate treatment] should be protected and assured by the Congress and *the courts*". (Emphasis added.) Conf. Rep. *supra,* at 42, U.S.Code Cong. & Admin.News 1975, p. 961. The Fourth Circuit has construed this language to permit a judicial remedy, although limited to state rather than federal court. *U.S. v. Solomon,* 563 F.2d 1121, 1125 (1977) (holding that United States Attorney General, without specific statutory authority, cannot bring suit to enforce right to treatment). In addition, participating states are required to establish an independent agency "to protect and advocate the rights of persons with developmental disabilities, and . . . to pursue *legal,* administrative, and other appropriate remedies to insure the protection of the rights of such persons who are receiving treatment, services or habilitation within the State . . . ." (Emphasis added.) 42 U.S.C. sec. 6012(a); 45 C.F.R. sec. 1386.-70. *Cf. Rouse v. Cameron,* 125 U.S.App. D.C. 366, 370–71, 373 F.2d 451, 455–56 (1966). The enforcement of individual rights, however, cannot be achieved solely by withholding federal funds; not only is the Secretary incapable of investigating every violation, but the Secretary may quite properly be unwilling to withhold funds for a single violation. Thus, the advocacy agency and a private right of action are crucial to protect the rights secured by the Act.[3]

▆▆▆ The legislative scheme, purpose and history also support an implied cause of action, suggested in the alternative to sec. 1983 by plaintiffs. The four criteria articulated by the Supreme Court as a prerequisite to implication in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), are all satisfied by the instant claim. First, developmentally disabled individuals are the "especial benefi[ciaries]" of the Act. Second, evidence of legislative intent to create a private right of action, discussed *supra,* is substantial. Third, without a private

**3.** That agency appointed by the Governor of Rhode Island, the Rhode Island Protection and Advocacy System, Inc., has sought to intervene as party-plaintiff in the instant suit and has filed an amicus brief in support of plaintiffs. Contrary to defendants' argument, like any agency charged with enforcement of statutory provisions, the advocacy agency need not show injury to the agency in order to initiate suit or intervene on behalf of an injured party. The live case or controversy requirement of Art. III is satisfied by injury to Timothy. Congress can charge an agency with representation and protection of the statutory rights of the particular-

ly helpless developmentally disabled. *See Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Intervention by proposed intervenors, whose insight into the problems and statutory protection of the developmentally disabled has already proved valuable, is granted. Rule 24, Federal Rules of Civil Procedure. The Act does not, however, indicate that review by this agency is a prerequisite to initiation of suit by an injured party. Although not required, a preferable course for a potential federal plaintiff would involve submission of the complaint first to the independent agency for resolution short of litigation.

right of action to focus on and redress individual past violations and deter future ones, the guarantees promised by the Act would have little effective meaning. A remedial scheme that addressed only institution-wide wrongs and ignored individual wrongs would be inconsistent with Congress' central concern to correct the past neglect by large institutions of individual rights and differences in needs and potential. *Compare with Wyatt v. Aderholt,* 503 F.2d 1305, 1316 (5th Cir. 1974). Finally, the action described by the Court would not tread on the traditional state turf of malpractice actions. A statute-based action that remedied a treatment plan is different in kind from a malpractice action for negligence. *Compare with Patton v. Dumpson,* 425 F.Supp. 621 (S.D.N.Y.1977) (constitutional basis rejected). Similar consideration of the four *Cort* factors has convinced several courts that the federal statute prohibiting discrimination against the handicapped, 29 U.S.C. sec. 794, creates an affirmative right enforceable by an action brought by a class of wronged, handicapped individuals. *Lloyd v. Regional Transportation Authority,* 548 F.2d 1277 (7th Cir. 1977), *relying on Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). *Accord Leary v. Crapsey,* 566 F.2d 863 (2d Cir. 1977); *United Handicapped Federation v. Andre,* 558 F.2d 413 (8th Cir. 1977).[4]

**B. Constitutional Claims**

■ Because the statutory right is at least as broad as any constitutional right to treatment, the Court need not reach the difficult question of whether Timothy has a valid constitutional claim. *E. g., Rouse v. Cameron,* 373 F.2d 451; *see, also, Lau v. Nichols,* 414 U.S. at 566, 94 S.Ct. 786, 39

L.Ed.2d 1. The constitutional issue is made particularly difficult by the circumstances of Timothy's confinement. Although the facts are not completely known to the Court, it appears that Timothy was committed to IMH by his parents, plaintiffs also in this suit, and the hospital has made no attempt to keep Timothy against his own or his parents' wishes. *Compare with O'Connor v. Donaldson,* 422 U.S. 563, 567–68, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Whether the voluntariness of Timothy's confinement vitiates his claim to a constitutional right to treatment, as held in the context of the mentally ill in *Harper v. Cserr,* 544 F.2d at 1123, *accord Goodman v. Parwatikar,* 570 F.2d 801, 804–05 (8th Cir. 1978), or, whether the choices between treatments and institutions for mentally retarded children and their parents, given economic and familial realities, are so limited as to be tantamount to involuntary confinement, triggering the constitutional right, *Halderman v. Pennhurst State School & Hospital,* 446 F.Supp. 1295 (E.D.Pa.1977); *New York State Ass'n for Retarded Children, Inc. v. Rockefeller,* 357 F.Supp. 752, 761–62 (E.D.N.Y.1973); *cf. Davis v. Watkins,* 384 F.Supp. 1196 (N.D. Ohio 1974); *Inmates of Boys' Training School v. Affleck,* 346 F.Supp. 1354, 1364–65 (D.R.I.1972), is the hard constitutional issue avoided by today's statutory holding.

However, the First Circuit in *Harper,* while rejecting a constitutional right to treatment for a voluntary patient, proceeded to recognize a constitutional right to a safe and humane environment for the relatively helpless residents of state institutions. *Accord Goodman v. Parwatikar,* 570 F.2d at 804–05. Plaintiffs' allegations that IMH staff were repeatedly advised of Tim-

---

**4.** The strong evidence of legislative intent to permit a private cause of action by an individual to redress violation of the "bill of rights", as well as the availability of sec. 1983, distinguishes the instant suit from that rejected by the Seventh Circuit in *Cannon v. University of Chicago,* 559 F.2d 1063 (1976). In Cannon, because of the elaborate administrative scheme, the individual rather than class nature of the suit and the private rather than public nature of the defendant educational facility, the Court refused to imply a cause of action based

on 20 U.S.C. sec. 1681 which prohibits sex discrimination by educational institutions receiving federal funds. The instant suit involves a state-operated facility; today's decision is so limited. Although plaintiffs are individuals rather than a class, the legislation's particular concern with individual rights justifies this action. *Compare with Lau v. Nichols,* 414 U.S. at 571–72, 94 S.Ct. 786 (Blackmun, J., concurring); *Lloyd v. Regional Transportation Authority,* 548 F.2d at 1287; *Patton v. Dumpson,* 425 F.Supp. at 624–25.

othy's adverse reactions to phenothiazines by his parents, who told them not to administer the drugs, and the case records, would, if established, cross the shadowy line from negligent to constitutional tort. Taking the cue for caution from the *Harper* Court, further factual development is required. Upon further discovery, the repeated prescription of phenothiazines may be causally linked to a failure to transpose the notice of Timothy's sensitivity to all phenothiazines, not just Haldol, from the physicians' daily sheets and case record to the records maintained at the nurses' station. Whether this failure is more than simply negligence but, rather, "wanton callousness" will depend, in part, on evidence of IMH physicians' practice of referring only to the brief summaries at the nurses' station instead of the case records, of the repetition of the same course of events—prescription of phenothiazines, severe reaction, notation in case record but not on file—which placed the staff clearly on notice of the high degree of potential danger to Timothy and of the high degree of helplessness of Timothy.

## II. Proper Defendants

### A. State of Rhode Island

▮ The State of Rhode Island has waived its sovereign immunity pursuant to R.I.G.L. sec. 9–31–1 (1969) with regard to suits in both state and federal court. *Bowen v. Evanuk,* 423 F.Supp. 1341 (D.R.I.1976). However, to be subject to suit, either sec. 1983 or the implied cause of action must provide for suits directly against the state. Prior to the Supreme Court's revolutionary decision this term in *Monnell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1977), the subjects or "persons" liable under sec. 1983 did not include municipalities, *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), or states, *Fitzpatrick v. Bitzer,* 427 U.S. 445, 452, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), but only officials. In *Monnell,* however, the Supreme Court held that municipalities could be di-

rectly sued under sec. 1983 if the allegedly unconstitutional action by municipal officials "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers". 436 U.S. at 690, 98 S.Ct. at 2036. Although the parameters of *Monnell* remain uncertain, the Court very clearly excised municipal liability under sec. 1983 based solely on *respondeat superior.* In a similar vein, the First Circuit refused to imply a cause of action against a municipality based solely on *respondeat superior. Kostka v. Hogg,* 560 F.2d 37, 41–45 (1st Cir. 1977).

In their Complaint, plaintiffs have based suit against the state of Rhode Island solely on *respondeat superior.* Paralleling municipal liability, *Fitzpatrick v. Bitzer,* 427 U.S. at 452, 96 S.Ct. 2666, a state which has waived its Eleventh Amendment immunity is not subject to suit for damages under sec. 1983 or under an implied cause of action if its involvement in the wrong is no more than as employer of the offending officials, as alleged here. *But, cf. Monnell v. Department of Social Services,* 436 U.S. at 690 n. 54, 98 S.Ct. 2018 (expressly does not decide question of state liability).

### B. Defendant Bannash

▮ Plaintiffs allege that Dr. Bannash was both negligent and provided inappropriate medical treatment to Timothy in violation of the Act. In accordance with the discussion of the statutory right *supra,* if plaintiffs establish that Dr. Bannash knew of Timothy's previous reaction to phenothiazines but nevertheless prescribed Prolixin, *not* because he negligently failed to check Timothy's case records housed in the basement, but solely and deliberately for the purpose of controlling Timothy's behavior without *any* ostensible habilitative purpose, a statutory violation will be proved. Similarly, if Dr. Bannash, aware of Timothy's sensitivity, deliberately or recklessly disregarded these harmful side-effects, a constitutional tort would be established.[5] *See*

---

5. Defendants argue that plaintiffs have not pleaded a constitutional claim of wanton neglect against Dr. Bannash. Although inartfully pleaded, the repetition of paragraph 17 under Claim II against Dr. Bannash is sufficient.

*Estelle v. Gamble,* 429 U.S. 97, 105–6, 97 S.Ct. 285, 50 L.Ed.2d 251 (1977).

To recover damages, plaintiffs will also have to overcome Dr. Bannash's good faith immunity. *Downs v. Sawtelle,* 574 F.2d at 10–14; *Harper v. Cserr,* 544 F.2d at 1124–25. That immunity is a proper defense to both the constitutional and statutory damages claims. Rooted in the common law, *Pierson v. Ray,* 386 U.S. 547, 554–55, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), good faith immunity is an accommodation of the goals of compensation and deterrence without undue inhibition of public officials from performing their governmental functions. *Kostka v. Hogg,* 560 F.2d at 40. These rationales have equal force in the context of a civil right secured by federal statute as in the context of those secured by the Constitution. Therefore, Dr. Bannash will be liable only:

> if he knew or reasonably should have known that the action he took within the sphere of his official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the [plaintiff]. . . . *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975), quoted approvingly in *Downs v. Sawtelle,* 574 F.2d at 11. (Citations omitted.)

Good faith will not be defeated by a showing of mere negligence on Dr. Bannash's part; on the other hand, the objective component of good faith is not established by proof that Dr. Bannash believed he was acting in Timothy's best interests. *Downs v. Sawtelle,* 574 F.2d at 12. The extent of Dr. Bannash's knowledge of ·Timothy's sensitivity, crucial to both federal constitutional and statutory claims, has not been explored at the prediscovery stage.

Plaintiffs also apparently pend a negligence claim based on state law arising out of a "common nucleus of operative fact". *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Because Dr. Bannash is properly a defendant against federal claims, no problem of "pendent party" jurisdiction, *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), is raised by permitting the state claim to go forward as well in federal court.

### C. Dr. Bevilacqua

The claims against Dr. Bevilacqua must be dismissed. There are no allegations that Dr. Bevilacqua knowingly hired grossly incompetent staff, *Kostka v. Hogg,* 560 F.2d at 40, or even that he knew but failed to correct the alleged inappropriate or unconstitutional treatment of Timothy or the alleged inadequacy of the medical records in Timothy's particular case. Plaintiffs have not cited any specific state statute or decision that makes public officers vicariously liable for the torts of their subordinates. *Id.* at 40 n. 1. Dr. Bevilacqua's very broad statutory responsibility for administration of MHRH, R.I.G.L. sec. 40.1–7–5, cited by plaintiffs, does not expose him to damages liability for acts of subordinates of which he was unaware. *See Kostka v. Hogg,* 560 F.2d at 40 n. 2; *Duchesne v. Sugarman,* 566 F.2d 817, 832 n. 31 (2d Cir. 1977). Indeed, the language of that statute which charges Dr. Bevilacqua with responsibility for "developing the public policy and programs related to the needs of emotionally disturbed children", outlines the Director's concern with the general rather than the particular, as befits a public administrator of a large department employing several thousand. Plaintiffs have failed to allege that any of the alleged wrongs to Timothy were part of an explicit or implicit department policy or program or were authorized or approved by Dr. Bevilacqua. *Cf. Monnell v. Department of Social Services,* 436 U.S. 694 at n. 58, 98 S.Ct. 2037 n. 58. Without more direct involvement, Dr. Bevilacqua is not liable in damages. *Compare with Duchesne v. Sugarman,* 566 F.2d at 830–32. *Rizzo v. Goode,* 423 U.S. 362, 370–71, 377, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) suggests that injunctive relief is sim-

ilarly unavailable against Dr. Bevilacqua. *Duchesne v. Sugarman,* 566 F.2d at 831. Since plaintiffs ask for relief affecting only Timothy's case and not a class, Dr. Bevilacqua is not even a necessary party for effective injunctive relief.[6]

Permission to amend the Complaint granted. Claims against the State of Rhode Island and Dr. Bevilacqua dismissed; claim against Dr. Bannash not dismissed. Permission to intervene granted to Rhode Island Protection & Advocacy System, Inc.

6. The Court does not agree with defendants that Dr. Karkalas' actions have mooted any injunctive relief. Plaintiffs request something more than Dr. Karkalas has already voluntarily undertaken—namely, prohibition against all drugs which have known adverse effects on Timothy, further tests and an appropriate treatment program. (Second Amended Complaint). Nor is injunctive relief necessarily inappropriate, as defendants argue; it would not enjoin negligent treatment but rather deliberate, inappropriate treatment.