In the Matter of the Petition of Ora ACKERMAN for the Commitment of Charles Hartman to the Fort Wayne State Hospital and Training Center.

No. 3–379A60.

Court of Appeals of Indiana, Fourth District.

Sept. 24, 1980.

Theodore L. Sendak, Atty. Gen., David Michael Wallman, Deputy Atty. Gen., Indianapolis, for appellant.

Pedro J. DeJesus, Indiana Protection & Advocacy Service Com'n for the Developmentally Disabled, Indianapolis, for appellee.

Ronald M. Soskin, National Center for Law and the Handicapped, Inc., South Bend, for amicus curiae.

CHIPMAN, Judge.

The State of Indiana appeals from an order of the Elkhart Superior Court which, in part, directed the Fort Wayne State Hospital and Training Center to implement a specific treatment or habilitation program on behalf of the appellee, Charles Hartman.

We affirm.

This case concerns the rights of an individual who has been involuntarily institutionalized by the State of Indiana. Specifically, it raises the question whether an involuntarily committed mentally retarded individual has a right to treatment,[1] and if so, what level of treatment is required. The case also questions the role of our trial courts in protecting and enforcing the rights of the mentally retarded.

The appellee, Charles Hartman, is presently twenty–eight years old. At the age of nine he became a ward of the Elkhart County Department of Public Welfare and was subsequently placed in three foster homes. Each placement proved unsuccessful, and in 1964, at age twelve, Charles was admitted "voluntarily"[2] to the Fort Wayne State Hospital and Training Center and he has remained institutionalized since.

In the spring of 1977, Charles asked to be released from the hospital. In response, the hospital, through its superintendent, Ora R. Ackerman, filed with the trial court a "Petition for Involuntary Commitment." A hearing followed and on July 2, 1977, the trial court found Charles to be both gravely disabled and dangerous[3] and ordered Charles involuntarily committed until such time as the superintendent deemed him eligible for discharge. The cause was then removed from the court's active docket.

On April 6, 1978, the hospital filed with the trial court a periodic progress report for Charles along with a habilitation program plan. After a review of these materials, the court ordered Charles' involuntary commitment to continue without a hearing.

The controversy ripened on May 11, 1978, when Charles filed what was denominated as a "Request for Review or Dismissal of Regular Commitment" pursuant to Ind. Code 16 14 9.1 10(g).[4] During the hearing which followed it became apparent Charles had not responded well to the treatment he had received during his many years of institutionalization. Those who had worked with Charles over the years saw little chance for him to improve his condition given the level of treatment then available at the hospital. The trial court asked Mr. Tom Burkross, a sociologist who had

---

1. The amicus brief filed by the National Center for Law and the Handicapped, Inc. points out mental retardation is primarily an educational problem and not a "disease" or disability which can be "cured" through "treatment." Strictly speaking, therefore, "treatment" is an inappropriate term. Instead, the mentally ill are in need of "habilitation." However, throughout this opinion the terms "treatment" and "habilitation" will be used interchangeably.

2. Although the circumstances surrounding Charles' admission to the hospital in 1964 were not fully documented, a 1964 psychiatric report by Dr. Robert Greenlee stated, "Reason for admission seems to be his repeated truancies from the last three foster homes. He is reported to have become unmanageable and threatened a foster mother with a knife."

3. At the time of Charles' involuntary commitment, Ind.Code 16–14–9.1-–10(d) authorized the court to order the commitment of an individual when he or she was found to be:
"(1) mentally ill and either gravely disabled or dangerous; and
(2) in need of custody, care, treatment, or in need of continued custody, care, or treatment;"
Ind.Code 16–14–9.1–1(a) defined "mental illness" as "a psychiatric disorder which substan-

tially disturbs a person's thinking, feeling or behavior and impairs the person's ability to function. For the purpose of this chapter, "mental illness may include, but shall not be limited to, any mental retardation . . . .."
Ind.Code 16 14·9.1(b) defined "gravely disabled" as "a condition in which a person as a result of a mental illness is in danger of coming to harm because of his inability to provide for his food, clothing, shelter, or other essential human needs."
Ind.Code 16-14-9.1–1(c) defined "dangerous" as "a condition in which a person as a result of mental illness presents a substantial risk that he will harm himself or others."

4. Ind.Code 16 ·14·9.1 10(g) provided, in relevant part:
"(g) Upon receiving a copy of the court order [of commitment], the patient or his representative may request a hearing for review or dismissal of the commitment. This· right of review of the regular commitment is limited to one [1] review per year, unless the court determines that there is good cause for an additional review." [bracketed material supplied]

worked with Charles since 1974, whether a treatment plan could be devised, given the necessary resources, which would give Charles a reasonable chance to improve. Burkross stated such a plan could be drawn up within thirty days. The trial court took Charles' petition under advisement and requested he be sent a copy of the new treatment plan. The new plan was forwarded to the court in August 1978 and shall hereinafter be referred to as the "August Plan."

On November 28, 1978, Charles filed a petition which requested the court order the implementation of the August Plan. This petition alleged Charles had constitutional and statutory rights to appropriate treatment which would give him a "decent chance" to achieve his developmental potential and facilitate his release and return to the community, a level of treatment which

Charles alleged he had never been provided. Copies of the petition were served upon Superintendent Ackerman, the Department of Mental Health, and the Attorney General. A hearing was set for December 20, 1978.

On the day of the hearing, Superintendent Ackerman submitted to the trial court an alternative treatment plan for Charles (hereinafter referred to as the "December Plan"). At the hearing the court heard expert testimony concerning the relative merits of the August and December Plans, and also considered methods of financing the former, which required a larger and better trained staff. Following the hearing the trial court made findings of fact and conclusions of law [5] and entered the following order:

"1. That the respondent be recommitted to the Fort Wayne State Hospital and

---

5. The following findings of fact and conclusions of law were entered by the trial court:

"1. Charles Hartman is a developmentally disabled person as defined by statute.

2. Prior to the 1st day of December, 1978, Charles Hartman had not received in the 14 years of his confinement at Fort Wayne State Hospital and Training Center such an individualized program of habilitation as would meet his constitutional and statutory rights to a program offering him even a reasonable chance at habilitation.

3. A release of the respondent from commitment and return to his home community at this time would offer at best a 5% chance of succeeding in a community setting and a 95% chance that the respondent would engage in serious antisocial behavior and would ultimately, through the criminal justice system, be committed to a penal facility for such behavior.

4. That the treatment programs instituted by the Hospital prior to December 1, 1978, on a continuum of 0 to 10 have offered the respondent and would continue to offer the respondent not much more than a No. 2 chance of habilitation except through maturation, a natural process that would take 5 years or more. On the same continuum the program proposed by the Fort Wayne State Hospital and Training Center and filed herein August 15, 1978, would represent a minimum of a No. 5 chance of habilitation in a period of time of approximately 2 years.

5. On December 20, 1978, the Hospital tendered to the court a new proposed habilitation program for the respondent.

6. The habilitation program tendered December 20, 1978, represents the maximum potential program for the respondent under the present staff and other limitations of the Hospital.

7. The program tendered December 20, 1978, would offer the respondent a No. 4 chance of habilitation over a period of 2 or more years.

8. That the General Assembly of the State of Indiana will meet in session duly convened in January, 1979 to, among other things, undertake a complete budgeting process for the entire State of Indiana for the biannum commencing July 1, 1979, and ending June 30, 1981.

9. That the Fort Wayne State Hospital and Training Center and the Department of Mental Health have not taken all steps available to them through normal budgeting processes and legislative processes to secure additional funds for implementation of the best possible treatment program for the respondent Charles Hartman.

10. That the plan submitted to the Court August 15, 1978, would be the best possible program for the respondent but cannot be undertaken because of the lack of at least 10 staff positions of certain educational requirements.

11. That the Fort Wayne State Hospital and Training Center has, since approximately December 1, 1978, undertaken actions which are presently maximizing their ability to provide for and meet the rights of the respondent Charles Hartman under budget and staff limitations presently imposed upon the hospital.

Having considered the facts introduced at the hearing the Court would now make the following conclusions of law:

Training Center until the 30th day of June, 1979;

2. That the Fort Wayne State Hospital and Training Center will implement, in the interim, the treatment plan proposal tendered to the court December 20, 1978;

3. That the Fort Wayne State Hospital and Training Center and the Department of Mental Health of the State of Indiana will forthwith take all steps available to them to secure sufficient funds for the implementation of the program of August 15, 1978, such steps, not by way of limitation, being:

(a) As of July, 1978, there were approximately 140 positions on the manning table for the Hospital that were vacant. Steps should be taken to reclassify such positions to result in the creation of the additional 10 specialized positions required by the August 15, 1978, treatment plan in such a manner as so not to increase the overall budget of the hospital.

(b) To seek out any and all Federal funds that might be available for the implementation of the treatment plan of August 15, 1978, as a pilot program.

(c) To seek augmentation through the budget director and the Commission on State Budget of funds for the Hospital to implement the August 15, 1978, program;

(d) To seek transfer of funds from within the Department of Mental Health, from other State Agencies, and/or from the Governor's contingency fund so as to be able to implement fully the August 15, 1978, treatment plan;

(e) To submit to the General Assembly of the State of Indiana in the year 1979 a request for the specific funding of the Charles Hartman habilitation program of August 15, 1978.

4. The Hospital shall report to the Court on or before the 1st day of February, 1979, and the first day of each month thereafter the steps taken by them to implement the program tendered to the Court December 20, 1978, the steps taken to secure additional funding to implement fully the program of August 15, 1978, and the progress of the respondent under the program being presently maintained for him.

5. The Association for the Disabled of Elkhart County (Hereafter ADEC) shall draft a definitive proposed program to take over the services for the respondent and shall further taken (sic) all steps possible to secure funding for such program and shall report to the court at not less than 90 day intervals their progress herein.

6. The Hospital in conjunction with ADEC shall arrange a program of temporary leaves of respondent from the hospital to the control of ADEC in order to commence a process of reintegratation (sic) of the respondent into the community. The Hospital and the Department of Mental Health shall further take all steps possible to achieve funding for ADEC for such program of habilitation as ADEC will hereafter develop and tender to the court and to the Department of Mental Health for the handling of the respondent at the time of his release from commitment.

1. The respondent Charles Hartman is a developmentally disabled person as defined by law and is therefore entitled under the Fourteenth Amendment to the Constitution of the United States of America and the Developmentally Disabled Assistance and Bill of Rights Act (42 U.S.C.A. Section 6,000 [6001] et seq.) to a habilitation program designed to maximize his developmental potential in a setting least restrictive of his personal liberty.

2. That this Court has the power through order of court enforceable by contempt and through mandate to guarantee to this respondent and others similarly situated their constitutional and statutory rights under the constitutions and statutes of the United States of America and the State of Indiana.

3. That so long as the hospital is maximizing its present resources to meet the needs of the respondent, this court and other courts similarly situated should refrain from utilizing their inherent powers to enforce the constitutional and statutory rights of the respondent and others similarly situated."

7. That the parties will appear again before the court for such further hearings as the court may from time to time hereafter order, including but not limited to a review hearing for commitment to be held in the month of June 1979.

8. That the orders entered by the Court this date shall be continuing orders and shall be in the nature of interim orders and shall not in any manner affect or impede the ability of this court to hereafter enter additional and supplemental orders controlling the actions of the parties and/or to secure funds for the implementation of a reasonable habilitation program for the respondent.

9. That the Clerk shall cause a copy of this Order to be served upon Pedro J. DeJesus, Legal Advocacy Director of the Indiana Protection and Advocacy Service Commission for the Developmentally Disabled; upon David Michael Wallman, Deputy Attorney General of the State of Indiana; upon Ora Ackerman, Superintendent, Fort Wayne State Hospital and Training Center."

The State appeals from the trial court's decision raising issues which we have rephrased as follows:

1) Whether the United States Constitution and/or companion federal and state statutes mandate a specific level of treatment for an involuntarily committed mentally retarded individual,

2) Whether there was sufficient evidence produced to establish that the treatment provided to Charles Hartman fell short of any constitutional or statutory minimum, and

3) Whether the trial court had subject matter jurisdiction to order the implementation of a specific treatment plan and to order various state officials to seek funding for such a plan.

## I. RIGHT TO TREATMENT

■ The trial court concluded Charles Hartman had a right to treatment guaran-

teed by the Fourteenth Amendment to the U. S. Constitution and the Developmentally Disabled Assistance and Bill of Rights Act, Pub.L. No. 94-103, 89 Stat. 486 (1975) *codified at* 42 U.S.C. §§ 6001–6081 (1976). Indeed, there is now a substantial body of federal case law which recognizes a constitutional right to treatment for both mentally ill and retarded individuals who are involuntarily committed by the states. *See e. g., Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974); *Donaldson v. O'Connor,* 493 F.2d 507 (5th Cir. 1974), *vacated* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Halderman v. Pennhurst State School and Hospital,* 446 F.Supp. 1295 (E.D.Pa.1977), *affirmed in part, reversed and remanded in part,* 612 F.2d 84 (3rd Cir. 1979); *Gary W. v. Louisiana,* 437 F.Supp. 1209 (E.D.La.), *modified,* October 28, 1976; *Davis v. Watkins,* 384 F.Supp. 1196 (N.D.Ohio 1974); *Welsch v. Likins,* 373 F.Supp. 487 (D.Minn.1974), *affirmed in part, vacated and remanded in part,* 550 F.2d 1122 (8th Cir. 1977). However, we are permitted to reach constitutional questions only when such a determination is absolutely necessary. *Peters v. Board of Commissioners of Gibson County* (1963) 244 Ind. 544, 194 N.E.2d 619. Accordingly, we are obliged to decide whether the trial court's order can be supported on statutory grounds before we adjudicate a constitutional issue.

■ The Developmentally Disabled Assistance and Bill of Rights Act (hereinafter referred to as "the Act") was passed as an amendment to the Developmental Disabilities Services and Facilities Construction Act. In the so called Bill of Rights section, 42 U.S.C. § 6010, Congress clearly expressed its intention to create certain rights in favor of the developmentally disabled, a class of persons which includes the mentally retarded. Section 6010 [6] provides, in part:

"(1) Persons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities.

---

**6.** The entirety of § 6010 reads as follows:
"§ 6010. *Rights of the developmentally disabled*

Congress makes the following findings respecting the rights of persons with developmental disabilities:

(2) The treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential óf the person and should be provided in the setting that is least restrictive of the person's personal liberty."

Each federal court which has faced the question whether the Act creates substantive rights enforceable by way of a private cause of action has responded in the affirmative. In *Naughton v. Bevilacqua*, 458 F.Supp. 610 (D.R.I.1978) the plaintiff, a moderately retarded individual suffering from childhood schizophrenia, brought an action against the State of Rhode Island and the director of its Department of Mental Health to permanently enjoin and recov-

er damages for alleged violations of rights secured by the Act. Naughton alleged he had suffered serious adverse reactions due to the excessive use of the drug Prolixin, a tranquilizer., The district court held the plaintiff had alleged facts which, if proved, would constitute a violation of his statutory "right to appropriate treatment" and "habilitation" designed to maximize his developmental potential. *Id.* at 614. In addition, the court found in light of the Act's legislative history, scheme and purpose, the statutory right to treatment was enforceable under 42 U.S.C. § 1983, and by way of an implied cause of action under the Act itself, eminently satisfying the criteria for implication articulated by the United States Supreme Court in *Cort v. Ash*, (1975) 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26, 458 F.Supp.

(1) Persons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities.

(2) The treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty.

(3) The Federal Government and the States both have an obligation to assure that public funds are not provided to any institutional or other residential program for persons with developmental disabilities that –

(A) does not provide treatment, services, and habilitation which is appropriate to the needs of such persons; or

(B) does not meet the following minimum standards:

(i) Provision of a nourishing, well balanced diet to the persons with developmental disabilities being served by the program.

(ii) Provision to such persons of appropriate and sufficient medical and dental services.

(iii) Prohibition of the use of physical restraint on such persons unless absolutely necessary and prohibition of the use of such restraint as a punishment or as a substitute for a habilitation program.

(iv) Prohibition on the excessive use of chemical restraints on such persons and the use of such restraints as punishment or as a substitute for a habilitation program or in quantities that interfere with services, treatment, or habilitation for such persons.

(v) Permission for close relatives of such persons to visit them at reasonable hours without prior notice.

(vi) Compliance with adequate fire and safety standards as may be promulgated by the Secretary.

(4) All programs for persons with developmental disabilities should meet standards which are designed to assure the most favorable possible outcome for those served, and

(A) in the case of residential programs serving persons in need of comprehensive health-related, habilitative, or rehabilitative services, which are at least equivalent to those standards applicable to intermediate care facilities for the mentally retarded promulgated in regulations of the Secretary on January 17, 1974 (39 Fed.Reg. pt. II), as appropriate when taking into account the size of the institutions and the service delivery arrangements of the facilities of the programs;

(B) in the case of other residential programs for persons with developmental disabilities, which assure that care is appropriate to the needs of the persons being served by such programs, assure that the persons admitted to facilities of such programs are persons whose needs can be met through services provided by such facilities, and assure that the facilities under such programs provide for the humane care of the residents of the facilities, are sanitary, and protect their rights; and

(C) in the case of nonresidential programs, which assure the care provided by such programs is appropriate to the persons served by the programs."

at 616.[7] Particularly persuasive was the fact the Conference Report on the bill states:

"These rights are generally included . . . in recognition by the conferees that the developmentally disabled . . . have a right to receive appropriate treatment for the conditions for which they are institutionalized, and that this right should be protected and assured by the Congress *and the courts.*"

H.R.Conf.Rep. No. 94–473, 42 (1975) reprinted in [1975] U.S. Code Cong. & Admin. News, pp. 919, 943, 961. [emphasis added] Section 6012(a) of the Act also requires the states to establish independent agencies with the responsibility and authority "to pursue legal, administrative, and other appropriate remedies to insure the protection of the rights of such persons who are receiving treatment, services, or habilitation within the State." The *Naughton* court recognized the sheer necessity of allowing a private action to enforce rights guaranteed by the Act:

"The enforcement of individual rights . . . cannot be achieved solely by withholding federal funds [from the states]; not only is the Secretary incapable of investigating every violation, but the Secretary may quite properly be unwilling to withhold funds for a single violation. Thus, the advocacy agency and a private right of action are crucial to protect the rights secured by the Act."

458 F.Supp. at 616 [bracketed material supplied]. In what now must be considered the leading case interpreting the Act, the Third Circuit U.S. Court of Appeals adopted the *Naughton* holding in *Halderman v. Pennhurst State School and Hospital*, 612 F.2d 84 (3rd Cir. 1979).

The district court in *Halderman* had found the conditions at Pennsylvania's Pennhurst State School and Hospital, a facility for the care and treatment of the mentally retarded, to be unsanitary, dangerous, and wholly inconsistent with any principles of normalization. 451 F.Supp. 1302–1308. Finding multiple violations of both constitutional and statutory rights, the district court entered a broad remedial order which, in part, directed the defendants to close the Pennhurst facility and to establish community living arrangements and implement individualized habilitation programs for its residents. *Id.* at 1326. The Third Circuit affirmed most of the district court's order but declined to address the issue of a constitutional right to treatment. Quoting extensively from Judge Pettine's opinion in *Naughton* the Court of Appeals held:

"[T]he Developmentally Disabled Assistance and Bill of Rights Act grants to the mentally retarded a right to treatment and habilitation. We further hold that retarded persons have a private right of action under the Act."

612 F.2d at 97. We take this opportunity to adopt the reasoning presented in *Naughton* and *Halderman* and hold that a mentally retarded individual institutionalized by the State of Indiana has a right to treatment and habilitation guaranteed by the Developmentally Disabled Assistance and Bill of Rights Act enforceable by way of a private cause of action.

■ Once we acknowledge the Act creates a right to treatment for the developmentally disabled, we believe it follows *a fortiori* that some minimum level of treatment is required. We find it unimaginable that Congress intended to establish a right to treatment which could be satisfied only

---

7. In *Cort v. Ash*, the U.S. Supreme Court set forth four factors to be considered in determining whether a federal statute carries with it a private remedy: 1) whether prospective plaintiffs are especial beneficiaries of the statute, 2) whether there is an indication of legislative intent to create a private remedy, 3) whether a private cause of action would further the policies of the statute, and 4) whether the cause of action is one traditionally relegated to the states.

by the slightest effort at habilitation.[8] However, it is certainly less than clear what standard Congress had in mind.

The language of the Act speaks of a right to "appropriate treatment" which should be "designed to maximize the developmental potential of the person." 42 U.S.C. § 6010. Clearly the Act prohibits the use of physical or chemical restraints as a substitute for a treatment program. 42 U.S.C. § 6010(3)(B)(iii) & (iv). Senator Cranston, speaking in favor of the legislation, spoke in terms of "necessary" treatment:

> "The Bill specifically provides that where institutional programs are appropriate, adequate support should be planned for them so that *necessary* treatment and habilitation can be given residential patients to develop their full potential."

121 Cong.Rec. 16,520 (1975) (emphasis added). There is also an indication Congress intended to codify what had been pronounced by the lower federal courts as a constitutional right of an involuntarily committed person to receive treatment which will give him a "*realistic opportunity*" to improve or be cured, *Wyatt v. Stickney*, 325 F.Supp. 781, 784–85 (M.D.Ala.1971) (emphasis added), or a "*reasonable opportunity* to be cured . . . ." *Donaldson v. O'Connor*, 493 F.2d at 520 (emphasis added). Senator Javits, speaking in support of the legislation, cited the *Wyatt* case. Senator Stafford, discussing the purpose of Title II–the Bill of Rights section–stated:

> "Title II was added to the bill to assist in the protection of the rights guaranteed under our Constitution for those individuals that will require institutionalization . . . ."

121 Cong.Rec. 16,516 (1975).

Therefore, it is reasonable to conclude when Congress spoke of "appropriate treatment" it implied *effective treatment*. As one writer has so eloquently stated:

> "Treatment is not adequate, or appropriate, or proper, or suitable unless it is

effective, or curative, or therapeutic. In other words, treatment cannot meet any minimal standard unless it accomplishes its purpose. The terms are less important than the concept. Treatment, whatever it may be, is undertaken in order to change the behavior which led to the person's confinement."

Schwitzgebel, *Right to Treatment for the Mentally Disabled: The Need for Realistic Standards and Objective Criteria*, 8 Harvard Civil Rights–Civil Liberties L.Rev. 513, 520 (1973). We hold that as the Act establishes a right to "appropriate" or necessary treatment, the legislation requires a treatment level which will give the person a reasonable opportunity to change the behavior which led to or requires his continual institutionalization.

## II. SUFFICIENCY OF THE EVIDENCE

■ The State next argues that even assuming Charles Hartman has a constitutional or statutory right to treatment, there was no showing the treatment afforded Charles in the past was legally insufficient. Of course, we view this claim as we do all other questions concerning the sufficiency of evidence presented to the trier of fact; we will consider the evidence in a light most favorable to the trial court's decision.

■ Few of the facts in this controversy were actually in dispute. Dr. Robert Greenlee, a psychiatrist and consultant to the hospital who has seen and treated Charles since his admission in 1964, classified Charles as mildly retarded to borderline. Charles has high intellectual and vocational potential. What prevents him from achieving this potential and thereby obtaining his release is his aggressive behavior. Dr. Raymond Clausman, director of psychological services at the hospital, referred to Charles as "sociopathic" and described his behavioral problem as follows:

---

**8.** We do not mean to imply, however, that only the "slightest" effort at habilitation was made in the present case.

"I think basically Charles has learned to perceive his environment and the people in it as very threatening. He learned that young. He also learned to respond to that kind of threat with aggression, fight. The fight then became a pattern of behavior that got reinforced because he accomplished things with it. So he was able to get what we might call secondary gains and this became a condition and a pattern of behavior, so whenever he gets frightened or frustrated, or can't satisfy his needs, he uses this behavior, and he gets intermittent reinforcement for it, because he succeeds. Not always, but on an intermittent basis and this is a strong method of keeping the behavior in force. What we are wanting to do is to stop this intermittent reinforcement for this kind of behavior and make him get his rewards in more appropriate ways."

Everyone at trial agreed the key to Charles' normalization and deinstitutionalization is control of his aggressive behavior—behavior characterized by physical and verbal abuse of the hospital staff and fellow residents.

Over the years Charles has been administered anti-psychotic or tranquilizing medication. In Dr. Greenlee's September 13, 1971, psychiatric evaluation of Charles, he stated, "In reviewing his medication it would appear to me that he is on what should be adequate tranquilizing medication at the present time." In his August 31, 1973 report, Dr. Greenlee wrote, "When I examined Charles, it was my impression that he was probably suffering from some degree of over medication, in that he seemed quite slow and lethargic and slurred his speech noticeably." In his July 18, 1977, evaluation of Charles, Dr. Greenlee wrote, "In reviewing Charles' medications, I note that he is currently on Mellaril 200 mg. tid and Stelazine 5 mg. bid as well as occasional Valium. I do not believe that control of this man's behavior is going to rest on medication." Finally, in Dr. Greenlee's October 2, 1978, evaluation he wrote, "I am of the opinion that behavioral control is probably not going to be possible with anti–psychotic or tranquilizing medication and I see no need for further experimentation or increase in dosage." Dr. Greenlee testified that drugs "have not achieved anything close to behavioral control."

Other efforts to deal with Charles' aggressive behavior have also proved ineffective. Behavioral "contracts", independent counseling and special reward programs were administered, but hospital staff either could not spend sufficient time which Charles to correctly reinforce his behavior, or, in spite of a more restrictive environment, Charles was able to manipulate the staff and his peers through physical intimidation. Mr. Jim Helm, program director of the maximum security module where Charles lived, testified that over the years of dealing with Charles he had basically met with failure. Tom Burkross acknowledged that given the resources of the hospital, there was little which could be done to change Charles' behavior. The only thing left for Charles to look forward to was the natural process of maturation, which even if it proved helpful, would take a minimum of five years. The trial court found:

"[T]he treatment programs instituted by the Hospital prior to December 1, 1978, on a continuum of 0 to 10 have offered the respondent not much more than a No. 2 chance of habilitation."

The August Plan, which Charles requested be implemented on his behalf, was formulated by Charles' module director, the hospital's director of social services, and by Dr. Clausman, director of psychological services. The nucleus of the August Plan was a ten member behavioral management team composed of a staff trained to deal with behavioral problems such as exhibited by Charles. Three members of the team were to be available throughout the day to respond to Charles' maladaptive behavior so as to make sure his aggression was not rewarded. Hopefully, as Charles' behavior improved he would be moved to a less restrictive area of the hospital and could then

take advantage of vocational training programs. Dr. Clausman testified that because of the highly trained staff called for in the August Plan, the plan offered Charles perhaps a fifty percent chance of success. Dr. Greenlee referred to the August Plan as probably "the best possible thinking of professionals in the state of the art."

The December Plan, submitted to the court as an alternative, was similar to the August Plan except for its initial phase; the December Plan did not call for additional trained staff but was formulated to function within the existing budget of the hospital.

We believe there was sufficient evidence to show the treatment afforded Charles Hartman prior to December 1978 was no longer "appropriate" treatment because it did not offer him a reasonable opportunity to improve his condition. Drugs had proved unsuccessful and certainly could not be administered as a substitute for an appropriate habilitation program. Other behavior control programs had proved unsuccessful. Charles' only hope for improvement would not come from the treatment provided, but through the natural maturing process.

The circumstances surrounding Charles' fourteen years of institutionalization are readily distinguishable from the horrid conditions which led the federal district court to order the closing of the Pennhurst Hospital in *Halderman.* We are not faced in this case with inhumane, unsanitary and unsafe premises. We are dealing instead with the good faith efforts of a hospital staff to help a retarded individual achieve his developmental potential with the funds allocated by the legislature. The court in *Halderman* confined itself to prohibiting institutional conditions which made effective therapy for *any* patient impossible. The *Halderman* court was not faced with the much more difficult task of determining which of various forms of treatment is "appropriate", yet the court recognized the ultimate necessity of doing so:

"[T]he federal statute . . . [is] focused on *individual* needs. Since the statutory rights to treatment, state and federal, vindicate the individual patient's fundamental interest in personal liberty, it is only fitting that the Commonwealth be required to undertake a case–by–case investigation into how each person's rights may best be facilitated."

612 F.2d at 115.

Indeed, as lawyers, not doctors, we view with some uneasiness the role assigned to our courts which requires a judicial determination of "appropriate" treatment. One federal district court has simply held that even were there a constitutional right to treatment, such a right would be non–justiciable because "specific, judicially ascertainable and manageable standards" of adequate care are lacking. *Burnham v. Department of Public Health*, 349 F.Supp. 1335, 1341 (N.D.Ga.1972), *reversed* 503 F.2d 1319 (5th Cir. 1974). However, we cannot simply close our eyes to the fact that Congress has created a right to appropriate treatment which must be "protected and assured by . . . the courts." H.R. Conf.Rep. No. 94–473, 42 (1975), U.S.Code Cong. & Admin. News 1975, p. 961. It is worth noting Indiana now has a patient's rights statute, enacted in 1979, which guarantees the developmentally disabled appropriate treatment defined as:

"(1) Mental health services or developmental training in accordance with standards of professional practice, appropriate to his needs, and designed to afford him a reasonable opportunity to improve his condition;"

Ind.Code 16–14–1.6–2(a)(1). The individual's right to this treatment level may be enforced in any court of competent jurisdiction. Ind.Code 16–14–1.6–10(1).

It therefore appears in spite of associated problems of justiciability, both our federal and state legislatures have entrusted our courts with the responsibility of enforcing the rights of the developmentally disabled by requiring a judicial determination of

whether a statutory minimum level of treatment is being afforded. We hold there was ample evidence in the present case to support the trial court's finding that treatment afforded Charles Hartman prior to December 1978 was no longer appropriate.

### III.
### JURISDICTION/APPROPRIATENESS OF THE TRIAL COURT'S ORDER

The State next argues the trial court erred by extending its jurisdiction to order implementation of a specific treatment plan. It is the State's position that the trial court's jurisdiction was limited to considering whether Charles Hartman was mentally ill and either gravely disabled or dangerous and in need of custody, care or treatment. While the court had the authority to examine existing facilities to select an "appropriate facility", argues the State, the court was not authorized by statute to "create" what it considered to be an appropriate facility, and had no authority to command specific treatment or order State officials to seek funding for such a treatment plan.

First, we note the State raises no issue concerning personal jurisdiction and we find no such objection was made before the trial court. Instead, the State argues the court lacked subject matter jurisdiction in this case. We disagree.

 While the State accurately describes the statutory procedure to be followed by the trial court in reviewing an involuntary commitment, Ind.Code 16–14–9.1–10(g), its argument ignores the fact the petition filed by Charles Hartman requesting implementation of the August Plan, in actuality the complaint in this matter, alleged Charles was being denied federal statutory and constitutional rights. Unless Congress provides otherwise, our trial courts, as courts of general jurisdiction, have jurisdiction concurrent with the federal courts in enforcing rights conferred by the Constitution and laws of the United States. *Pittsburg, C., C., & St. L. Ry. Co. v.*

*Mitchell,* (1910) 175 Ind. 196, 91 N.E. 735, *rehearing denied* 175 Ind. 196, 93 N.E. 996. The trial court clearly had jurisdiction to consider Charles Hartman's claim that his federal statutory rights were being violated. Once a violation was shown, the court also possessed inherent power and authority to formulate a proper remedy.

 The U. S. Court of Appeals in *Halderman* considered the appropriateness of the broad remedial order issued by the Pennsylvania District Court in that case, and, citing *Milliken v. Bradley,* (1977) 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745, held the trial court had broad and flexible equity powers to formulate a remedy tailored to cure the violation of the federal statute. 612 F.2d at 113. We believe the same standard is applicable in the present case.

The State objects to that portion of the trial court's order which directed the hospital to implement the December Plan and directed State officials to seek funding for the August Plan so it could be implemented as soon as possible. Implicit in the court's order is the finding that only the August Plan would afford Charles Hartman a reasonable opportunity to improve his condition, hence the requirement State officials seek funding for its implementation.

It appears both the August and the December treatment plans were designed to lead eventually to Charles Hartman's release and return to the community, and to that extent both plans were "designed to maximize the developmental potential of the person." The difference in the plans lies in their respective probabilities of success. Neither plan guaranteed success. Mr. Loren Thomas, director of the module which housed Charles Hartman, testified the December Plan would "probably not be very successful" because it lacked the additional, well-trained behavioral modification staff, which was the key to the August Plan. Mr. Helm expressed the same doubts about the December Plan:

"I really can't see it being a profitable type program. It is, like I said, similar to

some that have been incorporated in the past as far as walks, programs, and they have not succeeded.

[T]he main thing I don't see reading in this plan is the manpower that is going to be available to consistently carry out the new way."

Mr. Burkross also expressed his concern the December Plan could not be carried out consistently. Based upon the testimony of numerous expert witnesses, who essentially were in agreement as to the relative merits of the two plans, the trial court found the August Plan was the only treatment level which would give Charles Hartman at least as good as chance of success as it did failure. Charles was not *necessarily* entitled to the best possible treatment available, for the Act guarantees only treatment which affords the individual a reasonable chance of successful habilitation. It appears, however, that in light of Dr. Greenlee's characterization of the August Plan as "the best possible thinking of professionals", because of the severity of Charles' behavioral problem the "best possible" plan was the only "appropriate" plan–the only plan which would give Charles a reasonable chance of improving his condition.

While the expenditure of State funds would clearly not be justification for withholding appropriate treatment from an individual, the trial court proceeded cautiously by considering the cost of the August Plan and other alternatives to Charles' continued commitment at the hospital. Dr. Clausman estimated the cost of implementing the August Plan at the hospital would be $106,000 for the first year, most of that sum representing first year salaries for additional well–trained staff members. Mr. Helm testified the behavioral modification team required by the August Plan could work with three to five other individuals with similar behavioral problems as Charles improved. The team could also instruct other hospital staff on proper ways of dealing with the aggressive behavior of a resident.

Instead of ordering the implementation of the August Plan, however, the trial court compromised by ordering various state officials to use reasonable efforts to obtain funding for the August Plan and ordered immediate implementation of the December Plan, which could be administered without additional funds. Indeed, compared with the broad order upheld by the Federal circuit court in *Halderman*, which necessarily would require massive expenditures by the Commonwealth of Pennsylvania, the trial court in this case exercised a great deal of restraint. We find the court's order was strictly tailored to cure the violation of the federal statute in question.

Accordingly, the decision of the trial court is affirmed.

YOUNG, P. J., and MILLER, J., concur.